**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-1268
_____

RAJAE NINO,

<u>Appellant</u>

v.

THE JEWELRY EXCHANGE, INC.; WENDY TARAPANI

On Appeal from the U.S. District Court
for the District of the Virgin Islands

(D. V.I. No. 3-06-cv-00039)

District Judge: Honorable Curtis V. Gomez

Argued December 1, 2009

Before: McKEE, <u>Chief Judge</u>, FUENTES and NYGAARD,
<u>Circuit Judges</u>

(Opinion Filed: June 15, 2010)

Terri L. Griffiths, Esq. [ARGUED]
70C Lindbergh Bay, Suite 134
P.O. Box 307557
Charlotte Amalie, St. Thomas
USVI 00802

Counsel for Appellant

Jessica Chung, Esq. [ARGUED]
Treston E. Moore, Esq.
Moore, Dodson & Russell, P.C.
5035 (14A) Norre Gade, Suite 1
P.O. Box 310
Charlotte Amalie, St. Thomas
USVI 00802

Counsel for Appellees

Anna N. Occhialino, Esq.
Equal Employment Opportunity Commission
5th Floor
131 M. Street, N.E.
Washington, DC 20507

Counsel for Amicus Appellant

FUENTES, Circuit Judge:

Rajae Nino brought this action against his former employer, alleging that he was discriminated against on account of his gender and national origin. After litigating the matter before the District Court for fifteen months, the employer invoked an arbitration provision in Nino's employment contract and moved the District Court to compel the parties to arbitrate their dispute. Nino opposed the motion, arguing (1) that the arbitration agreement was unconscionable and, therefore, unenforceable, and (2) that by engaging in extensive litigation of this dispute, the employer had waived its right to compel arbitration. The District Court concluded that although the arbitration agreement contained unconscionable terms, those provisions could be severed from the contract and the remainder of its terms could be enforced. The Court then concluded that the employer did not, through its litigation conduct, waive its right to compel arbitration. We disagree.

In our view, the pervasively one-sided nature of the arbitration agreement's terms demonstrates that the employer did not seek to use arbitration as a legitimate means for dispute resolution. Instead, the employer created a system that was designed to give it an unfair advantage through rules that impermissibly restricted employees' access to arbitration and

that gave the employer an undue influence over the selection of the arbitrator. We hold that it is not appropriate, in the face of such pervasive one-sidedness, to sever the unconscionable provisions from the remainder of the arbitration agreement. We further conclude that the employer, by engaging in protracted litigation of this matter before belatedly seeking to arbitrate its dispute, waived its right to compel arbitration. We will thus reverse the District Court's order compelling the parties to arbitrate.

## I.

## A.

Diamonds International ("DI") is one of the world's largest jewelry retailers.[1] Nino is a Jordanian national who, in January 2000, agreed to work for DI as a salesperson and gemologist. Because Nino did not have a United States work visa when he was hired, he was assigned to DI's Aruba store, where he was paid $450 per week, plus commissions and housing. DI helped Nino obtain a United States work visa, after which it transferred him to its Alaska store. In September 2000, DI asked Nino to transfer to its St. Thomas location, and he agreed.

Upon his arrival at the St. Thomas store, Nino was given a copy of the company's standard employment contract. The

---

[1] The business entity named as a defendant in this lawsuit is Jewelry Exchange, Inc. Jewelry Exchange does business as Diamonds International, and we, like the parties, will refer to it by that name.

following are some of the procedures and deadlines contained in the contract that we find most troublesome. Article IV of the contract sets forth a grievance and arbitration procedure that the contract describes as "the sole, final, binding and exclusive remedy for any and all employment[-]related disputes." (J.A. at 80.) The remedial process outlined in Article IV requires an aggrieved employee to satisfy a series of requirements before he is eligible to arbitrate a dispute. First, the employee must file with his manager a detailed written grievance within five days of having received notice of the action complained of; the manager is then required to respond with a decision within two days. If the employee is unsatisfied with the manager's decision, he must re-file the grievance with the managing director within two days of having received the manager's decision; the managing director is then required to respond with a decision within five days. If the employee is not satisfied with the managing director's decision, he must file a written request for arbitration with the managing director within five days of having received the decision.

The contract makes clear that "[t]he time limits provided for above are binding and may not be waived except by written agreement of both parties," (id. at 82), meaning that an employee who does not file grievances within the applicable time frame loses the opportunity to arbitrate a dispute altogether. The contract insulates DI against a comparable risk of default—it provides that if DI fails to respond to an employee's grievance on a timely basis, "the last decision given by [DI] shall be a final and binding resolution of the grievance." (Id.)

If an employee satisfies these grievance filing requirements, DI must submit a request to the American

Arbitration Association ("AAA") for a panel of four arbitrators. The parties then select a single arbitrator from this list according to the following method:

> From the panel the Employer will strike the first arbitrator for whatever reason is unacceptable to the Employer. The Employee will then be allowed to strike one arbitrator from the remaining names of panel members. This process will continue until there remains one arbitrator who will be the arbitrator for this grievance or the parties can decide on an arbitrator that would be mutually acceptable.

(Id. at 81.) Stated more directly, DI is permitted to strike two members from the list of potential arbitrators, but the employee is permitted to strike just one.

The contract provides that the arbitration must take place at DI's place of business "at a date and time mutually convenient to both parties but in no event more than thirty (30) days after the selection of an arbitrator has been made." (Id.) The contract further provides that the parties are entitled to be represented by counsel at their own expense, that discovery may be had by either party pursuant to the Federal Rules of Civil Procedure, and that the fees and expenses of the arbitrator and stenographer are to be borne equally by the parties. Under the contract, the arbitrator "may make any award deemed legal and appropriate," and in doing so, "must interpret, apply and be bound by the Employer's rules, regulations, policies and procedures as well as applicable federal, state, local and

-6-

common laws." (Id. at 81-82.)

On the same day that Nino signed the employment contract, he signed a separate one-page document entitled "Diamonds International AGREEMENT," in which Nino acknowledged that he had received DI's employee handbook. (Id. at 84.) In this one-page agreement, Nino also acknowledged that DI was authorized "to unilaterally amend its rules, regulations, policies, and procedures without prior notice to its employees." (Id.) Nino further acknowledged "that the grievance procedure[] set forth in the employee handbook is my exclusive remedy for my employment-related disputes." (Id.)

The employee handbook, in turn, sets forth a process for dispute resolution that partially resembles, but is not identical to, the grievance process described in the employment contract. Specifically, the process described in the handbook differs from the contract in that it does not mention a right to arbitration, it requires employees to file the initial grievance within two (rather than five) days of the complained-of action, and it makes the decision of the managing director final as to all decisions except terminations, which may be further appealed to a management panel for final resolution. The materials that DI provided to Nino do not purport to reconcile the differences between the contract and the handbook, nor do they explain which of these two dispute resolution mechanisms actually applies to an employee's grievances.

**B.**

While the precise details of Nino's allegations of discrimination are not central to the issues presented in this appeal, we summarize them to provide the basis for his federal

-7-

complaint. Nino, who is a gay man, did not initially disclose his sexual orientation to his co-workers in St. Thomas. According to his allegations, Nino's co-workers began to fixate upon the issue of his sexual orientation, making increasingly hostile comments during his employment. Eventually, Nino revealed to his co-workers that he was gay. According to the complaint, this revelation served only to intensify the harassment by his co-workers, which escalated to both verbal and physical assaults to which DI's management turned a blind eye.

According to Nino's allegations, on February 2, 2005, one of Nino's co-workers, Jason Lettsome, falsely accused Nino of "coming on" to him. (J.A. at 43.) Nino reported this incident to the store manager, and Lettsome in turn complained to the manager that Nino "acted and talked like a female" when he interacted with Lettsome. (Id.) In response to these complaints, the manager wrote up both Nino and Lettsome for being disruptive. Shortly thereafter, Nino was suspended for one week without pay and was threatened with termination. The rationale behind Nino's suspension was that Nino had allegedly used a profanity when he was informed that he was being written up, although Nino contends that this was a pretext for discrimination. Nino did not return to work following his suspension, and he alleges that he was constructively discharged, i.e., that he was compelled to resign due to the hostile working environment. Nino did not file a grievance with DI related to his suspension and eventual resignation.

## C.

On March 3, 2006, Nino filed a complaint against DI and Wendy Tarapani, a manager of DI's St. Thomas store, alleging,

inter alia, that he had been discriminated against on the basis of gender and national origin.[2]  As the seventh of the ten affirmative defenses asserted in its answer to the complaint, DI contended that Nino was "contractually barred to any remedy other than one achieved by arbitration."  (Id. at 54.)  Notwithstanding this invocation of arbitration in its initial pleading, DI actively litigated this case for fifteen months between June 2006, when it was served with the complaint, and September 2007, when it finally filed a motion to dismiss based upon the arbitration clause.  In particular, the parties conferred and submitted a joint proposed case management order (which was silent as to the question of arbitration); they attended no fewer than ten pretrial conferences before the magistrate judge, throughout which DI was silent as to the matter of arbitration; and they engaged in extensive discovery, including service and supplementation of disclosures pursuant to Federal Rule of Civil Procedure 26, service and supplementation of written discovery, and attending four depositions.

On September 26, 2007, after litigating this dispute for fifteen months with no mention of the arbitration clause apart from the affirmative defense asserted in its answer to the complaint, DI filed a motion to dismiss Nino's claims on the grounds that the parties' contract made arbitration the sole method of resolving employment-related disputes.  Nino opposed the motion on the grounds that the one-sided nature of

[2] For simplicity, we refer to DI and Tarapani collectively as "DI" or "Defendants," except where it is necessary to identify them individually.

the arbitration clause made it unconscionable and that, through its litigation conduct, DI had waived any right to enforce the clause.

The District Court granted DI's motion to dismiss. The Court initially noted that aspects of the arbitration clause were unconscionable. The Court held, however, that the unconscionable provisions were severable from the remainder of the arbitration agreement, because they did not constitute an "essential part of the agreed exchange" between Nino and DI. Restatement (Second) of Contracts § 184. The Court thus held that the remainder of the arbitration agreement was enforceable. Additionally, the Court determined that DI had not waived its right to enforce the arbitration clause, notwithstanding its fifteen-month delay in filing the motion to compel arbitration, because DI had raised arbitrability as an affirmative defense in its answer to Nino's complaint, and because DI had not engaged in dispositive motion practice prior to moving to compel arbitration. Nino filed this timely appeal of the District Court's dismissal order.

**II.**

The District Court had jurisdiction over this case under 28 U.S.C. § 1331 and 48 U.S.C. § 1612(a). We have jurisdiction pursuant to 9 U.S.C. § 16(a)(3). See Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 89 (2000) (explaining that "where . . . the District Court has ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is 'final' within the meaning of § 16(a)(3), and therefore appealable"). "We exercise plenary review over questions of law concerning the applicability and

-10-

scope of arbitration agreements." Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 228 (3d Cir. 2008) (citation omitted). We likewise exercise plenary review over the District Court's determination of whether DI, through its litigation conduct, waived its right to compel arbitration. See Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 215 (3d Cir. 2007). We review the District Court's factual findings for clear error. See Zimmer, 523 F.3d at 228.

## III.

## A.

We first address the District Court's decision to sever the unconscionable aspects of the parties' arbitration agreement and enforce the remainder of the agreement. We have repeatedly recognized that the Federal Arbitration Act ("FAA") establishes a "strong federal policy in favor of the resolution of disputes through arbitration." Puleo v. Chase Bank USA, N.A, --- F.3d ----, 2010 WL 1838762, at *3 (3d Cir. May 10, 2010) (citation omitted); see also Spinetti v. Service Corp. Intern., 324 F.3d 212, 213 (3d Cir. 2003). Under the FAA, arbitration agreements "are enforceable to the same extent as other contracts." Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 263 (3d Cir. 2003) (internal quotations and citations omitted). "A party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." Id. (citing, inter alia, 9 U.S.C. §§ 3-4) (emphasis added).

The preceding qualification that an arbitration agreement be "valid and enforceable" before arbitration can be compelled, id., makes clear that when a party to an arbitration agreement

-11-

challenges the validity of the agreement, a threshold question of arbitrability is presented for the court to decide.[3] See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); see also Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 275-76 (3d Cir. 2004) ("It is up to the court, prior to granting such an order [compelling arbitration], to determine whether the parties entered a valid agreement to arbitrate.") (citation omitted). Nino's contention that the arbitration agreement at issue in this case is unconscionable presents such a question of arbitrability. See, e.g., Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996) ("[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."); see also Puleo, 2010 WL 1838762, at *5.  In addressing a claim that an arbitration clause is unconscionable, we apply the "ordinary state law principles . . . of the involved state or territory," which, in this case, is the law of the Virgin Islands.  Gay v. CreditInform, 511 F.3d 369, 388 (3d Cir. 2007) (citations omitted); see also Spinetti, 324 F.3d at 214.

---

[3] By contrast, "questions concerning the validity of the entire contract [as opposed to the validity of the arbitration clause itself] are to be resolved by the arbitrator in the first instance, not by a federal or state court." Preston v. Ferrer, 552 U.S. 346, 349 (2008) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006)) (emphasis added). Nino's challenge is limited to the provisions of the arbitration clause itself; he does not challenge the validity of the contract as a whole.

We have reviewed Virgin Islands law governing unconscionability challenges to arbitration agreements on numerous occasions. See, e.g., Edwards v. HOVENSA, LLC, 497 F.3d 355, 362-63 (3d Cir. 2007); Parilla, 368 F.3d at 275; Alexander, 341 F.3d at 264. Virgin Islands statutory law "mandates that we turn to 'the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute'" in evaluating whether the provisions of an arbitration agreement are unconscionable. Alexander, 341 F.3d at 264 (quoting 1 V.I. Code Ann. § 4). Section 208 of the Restatement (Second) of Contracts provides that "[i]f a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

Under Virgin Islands law, "[t]he doctrine of unconscionability involves both 'procedural' and 'substantive' elements." Edwards, 497 F.3d at 362 (citation omitted). The procedural component of the unconscionability inquiry looks to the "process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." Alexander, 341 F.3d at 265 (citation omitted). We have consistently found that adhesion contracts—that is, contracts prepared by the party with greater bargaining power and presented to the other party "for signature on a take-it-or-leave-it basis"—satisfy the procedural element of the unconscionability analysis. Id. (citation omitted); see also Edwards, 497 F.3d at 362; Parilla, 368 F.3d at 276. "A contract, however, is 'not unconscionable merely because the parties to

-13-

it are unequal in bargaining position.'" <u>Alexander</u>, 341 F.3d at 265 (quoting Restatement (Second) of Contracts § 208 cmt. d). Instead, a party challenging a contract on unconscionability grounds must also show that the contract is substantively unconscionable by demonstrating that the contract contains "terms unreasonably favorable to the stronger party." <u>Id.</u> (citation omitted). With these principles in mind, we turn to Nino's unconscionability challenge to the arbitration agreement at issue in this case.

**B.**

Looking first to the question of procedural unconscionability, we agree with the District Court that Nino had no opportunity to negotiate with DI over the contract's terms, that DI was the stronger contractual party, and that the arbitration agreement is thus procedurally unconscionable. First and most significantly, as the District Court expressly found, DI presented the arbitration agreement to Nino "for signature on a take-it-or-leave-it basis." <u>Id.</u> at 266 (citation omitted). As Nino explained in his deposition, during his first week at the St. Thomas store, DI's human resources manager provided him with a copy of the company's employment contract and instructed him to "read it and sign it," (S.A. at 18), without affording him any opportunity to negotiate over its terms. As the District Court explained, "Nino was given no reasonable choice in accepting the challenged Arbitration Agreement." (J.A. at 13.)

Moreover, a significant disparity in bargaining power existed between Nino and DI. As was the case in <u>Alexander</u>, DI is a large corporation that "conducts business throughout the

-14-

nation and the world, [and it] clearly possessed more bargaining power" than did Nino, a single, retail-level employee. Alexander, 341 F.3d at 266. DI likens Nino's case to Zimmer, in which we held that an employment contract was not procedurally unconscionable where the employee-plaintiff was "a Harvard-educated economist, previously employed by J.P. Morgan Chase and the Federal Reserve Bank of New York" who was weighing "multiple offers of employment at the time he accepted [defendant's] job offer." 523 F.3d at 229. Although Nino, as a college graduate, was better educated than were the plaintiffs in Alexander, we cannot agree with DI that Nino's bargaining leverage was even remotely comparable to that of the plaintiff in Zimmer. As the District Court recognized, Nino was dependent upon DI "with respect to his immigration status at the time he accepted the job offer." (J.A. at 13.) Quite unlike the plaintiff in Zimmer, who was fielding a host of employment offers at the time he negotiated his contract with the defendant, Nino depended upon DI for his very capacity to work in St. Thomas, where he had just been transferred. Given that the contract was presented to Nino on a take-it-or-leave-it basis, and given the disparity in bargaining power between the two parties at the time the contract was signed, we agree with Nino and the District Court that the arbitration agreement is procedurally unconscionable.[4]

---

[4] We pause to note an additional concern under the procedural unconscionability analysis. We have recognized that a party may show that an agreement is procedurally unconscionable where the agreement is so "convoluted" that the party could not have known what it was that he was agreeing to.

-15-

See Alexander, 341 F.3d at 265.

## C.

We likewise conclude that the arbitration agreement is substantively unconscionable because it contains terms unreasonably favorable to DI, the stronger party. See Zimmer, 523 F.3d at 228 ("Substantive unconscionability looks to whether the arbitration provision unreasonably favors the party asserting it.") (quotation marks and citation omitted). We address these unreasonable contract terms in turn below.

First, we agree with Nino and the District Court that the arbitration agreement's provision requiring that an employee file a grievance within five days of the complained-of incident in order to preserve his or her opportunity to arbitrate the dispute is substantively unconscionable. We have twice held in no uncertain terms that a thirty-day filing requirement in an arbitration agreement is substantively unconscionable.

Zimmer, 523 F.3d at 228. In this case, the contract and DI's employee handbook contain disparate dispute resolution mechanisms with conflicting deadlines and other irreconcilable differences. We find it hard to imagine that an employee in Nino's position reading these contradictory materials could realistically understand what sort of dispute resolution mechanism he was agreeing to. However, because the parties barely address this point—indeed, Nino raises it only in passing in his reply brief—we do not rest our procedural unconscionability holding on the convoluted nature of the agreement.

-16-

See Parilla, 368 F.3d at 277-78; Alexander, 341 F.3d at 266.  As we explained in Alexander and reiterated in Parilla, while "a provision limiting the time to bring a claim or provide notice of such a claim to the defendant is not necessarily unfair or otherwise unconscionable," the time period designated by the agreement must still be reasonable.  Alexander, 341 F.3d at 266; accord Parilla, 368 F.3d at 277-78.  A thirty-day filing period, we made clear in both cases, is "clearly unreasonable and unduly favorable" to the employer.  Alexander, 341 F.3d at 266.

If a thirty-day filing window is "clearly unreasonable," id., then the five-day filing requirement imposed by the parties' contract in this case is even more unduly favorable to DI than were the agreements at issue in Alexander and Parilla.  Indeed, the filing requirement in Nino's arbitration agreement is particularly unreasonable because it is both inflexible and one-sided.  With regard to its inflexibility, the agreement states that its filing requirements "are binding and may not be waived except by written agreement of both parties."  (J.A. at 82.)  As we have explained, such a provision enhances the unfairness of the narrow filing window because it "prevents an employee from invoking the continuing violation and tolling doctrines." Alexander, 341 F.3d at 267 (citing Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1175 (9th Cir. 2003)); see also Parilla, 368 F.3d at 277.  The one-sided nature of the five-day filing requirement exacerbates this unfairness.  As in Alexander, DI's "unfair advantage is only compounded by the fact that [DI itself] is apparently not required to provide detailed and written notice to an employee of any of its own claims within a strictly enforced [five]-day time period."  Alexander, 341 F.3d at 267. Indeed, the arbitration agreement in this case imposes no notice

-17-

requirement upon DI whatsoever. Moreover, while an employee's failure to adhere to the strict five-day filing requirement amounts to a default on his claims, the agreement expressly insulates DI from any risk of default—under the agreement, if DI fails to process an employee's grievance in a timely manner, "the last decision given by [DI] shall be a final and binding resolution of the grievance." (J.A. at 82.) The one-sided five-day filing requirement is manifestly unreasonable and is substantively unconscionable under Virgin Islands law. Parilla, 368 F.3d at 278; Alexander, 341 F.3d at 266.

Nino likewise argues, and the District Court found, that the arbitration agreement's requirement that the parties bear their own attorney's fees, costs, and expenses is substantively unconscionable. We agree. As we have explained:

> It is well established that arbitration is merely a choice of dispute resolution and does not infringe upon statutory protections. Therefore, if arbitration is to offer claimants the full scope of remedies available under Title VII, arbitrators in Title VII cases, just like courts, must be guided by Christiansburg [Garment Co. v. EEOC, 434 U.S. 412, 417 (1978),] and must ordinarily grant attorney fees to prevailing claimants rather than be restricted by private contractual language.

Spinetti, 324 F.3d at 216 (internal quotations and citations omitted); Parilla, 368 F.3d at 279 (same); Alexander, 341 F.3d at 267 (same).

Provisions in arbitration clauses requiring parties to bear their own attorney's fees, costs, and expenses work to "the

-18-

disadvantage of an employee needing to obtain legal assistance." Alexander, 341 F.3d at 267. Such provisions also undermine the legislative intent behind fee-shifting statutes like Title VII. Cf. Hackwell v. United States, 491 F.3d 1229, 1240 (10th Cir. 2007) ("Title VII's fee-shifting provision, 42 U.S.C. § 2000e-5(k), was intended to encourage private citizens to enforce the statute's guarantees and [] if successful plaintiffs were forced to bear their own attorneys' fees, few aggrieved parties would be in the position to advance the public interest.") (citing H.R. Rep. 102-40(I), Civil Rights Act of 1991 (Apr. 24, 1991)). The arbitration agreement's restriction on the arbitrator's ability to award attorney's fees, costs, and expenses is substantively unconscionable, as the District Court correctly concluded. See Spinetti, 324 F.3d at 216.

Finally, we turn to the arbitration agreement's provision governing the selection of an arbitrator, which Nino contends is substantively unconscionable. Under the arbitration agreement, if an employee manages to navigate the labyrinth of requirements for filing and refiling grievances in order to make a request for arbitration, DI is required to submit a request to the AAA for a panel of four arbitrators. The parties select a single arbitrator from this list according to the following process:

> From the panel the Employer will strike the first arbitrator for whatever reason is unacceptable to the Employer. The Employee will then be allowed to strike one arbitrator from the remaining names of panel members. This process will continue until there remains one arbitrator who will be the arbitrator for this grievance or the parties can decide on an arbitrator that would be

-19-

mutually acceptable.

(J.A. at 81.) Although it is phrased in neutral, procedural terms, the upshot of this provision is that DI is permitted to strike two arbitrators from the four-member AAA panel, whereas the employee is permitted to strike just one.

This provision is "one-sided in the extreme and unreasonably favorable to [DI]." Alexander, 341 F.3d at 267. It confers an advantage upon DI for no discernable purpose other than to stack the deck in its favor. Courts of Appeals have not hesitated to conclude that provisions in arbitration agreements that give the employer an unreasonable advantage over the employee in the selection of an arbitrator are unconscionable, see, e.g, Hooters of America, Inc. v. Phillips, 173 F.3d 933, 940 (4th Cir. 1999), and we have consistently recognized that arbitration provisions that confer an "unfair advantage" upon the party with greater bargaining power are substantively unconscionable, Alexander, 341 F.3d at 267. "By agreeing to arbitration in lieu of litigation, the parties agree to trade the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration," but they do not accede to procedures "utterly lacking in the rudiments of even-handedness." Murray v. United Food & Commercial Workers Intern., 289 F.3d 297, 303 (4th Cir. 2002) (internal quotations and citations omitted).

DI advances several arguments in defense of the arbitrator selection provision, all of which are thoroughly unconvincing. First, DI contends that because the agreement provides a secondary method for selecting an arbitrator—it permits the parties simply to agree upon "an arbitrator that

would be mutually acceptable," (J.A. at 81)—the selection process does not unreasonably favor DI. This argument invites us to conclude that because the agreement authorizes DI <u>not</u> to use the advantage it holds in the one-sided arbitrator selection process, the process cannot be considered unreasonably favorable to DI. Such reasoning would provide cold comfort to an employee who is unable to agree with DI upon a "mutually acceptable" arbitrator, (<u>id.</u>), and it does not diminish the unfair advantage accorded to DI over the selection of an arbitrator if the parties do not reach such an agreement. The presence of an alternative avenue for selecting an arbitrator does not render less unfair the one-sided mechanism set forth in the arbitration agreement.

DI next suggests that because "the panel is comprised of neutral, impartial arbitrators, as must be presumed, DI will not gain any benefit by having an additional strike." (DI Br. 16.) We cannot agree. DI is of course correct that the panel is to be comprised of arbitrators with no connection to, or interest in, the parties or dispute at hand. The AAA's rules require that "[n]eutral arbitrators serving under these rules . . . have no personal or financial interest in the results of the proceeding in which they are appointed and . . . have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias." <u>See</u> American Arbitration Association, Employment Arbitration Rules and Mediation Procedures, Rule 12(b)(2), http://www.adr.org/sp.asp?id=32904#12 (last visited June 14, 2010). But the fact that potential arbitrators are pre-screened for personal or financial interests in the controversy does not mean that a party derives no benefit from having a greater influence

-21-

over the arbitrator selection process. The ability to strike potential arbitrators from the panel is akin to a peremptory challenge in jury selection—it enables the parties to eliminate an arbitrator whose "sympathies" appear to align with one side or another, even if the potential arbitrator is not personally connected to the controversy or biased against a party. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 148 (1994) (O'Connor, J., concurring). Just as no experienced trial lawyer would dispute that "[t]he peremptory challenge is 'an important aspect of trial by jury,'" the ability to strike potential arbitrators undoubtedly confers a benefit, even if the arbitration panel is composed of disinterested and unbiased candidates. Darbin v. Nourse, 664 F.2d 1109, 1113 n.4 (9th Cir. 1981) (quoting Rosales-Lopez v. United States, 451 U.S. 182, 188 n.6 (1981)). Indeed, it would be difficult to understand the point of including in the arbitration agreement a mechanism for striking potential arbitrators if the parties did not stand to benefit from the exercise. We therefore reject DI's suggestion that it would derive no benefit from exercising its contractual right to strike twice as many potential arbitrators as Nino.

Finally, DI proposes that, rather than determining that the arbitrator selection clause is unconscionable, we should simply "alter[] the terms [of the arbitration agreement] so that the AAA supplies a panel of five (5) arbitrators instead of four (4)." (DI Br. 16.) Our precedent forecloses such an approach, and with good reason:

> [Section] 208 of the Restatement (Second) of Contracts provides the rule of decision here. That section provides, in relevant part, that "[i]f a contract or term thereof is unconscionable <u>at the</u>

-22-

> time the contract is made a court may refuse to
> enforce the contract." Restatement § 208
> (emphasis added). Accordingly, we must
> determine unconscionability as of the time the
> contract was formed, and an after-the-fact offer to
> waive certain contract provisions can have no
> effect on our analysis.

Parilla, 368 F.3d at 285 (emphasis in original). An arbitration agreement in an employment contract does not, in the context of litigation, become the employer's opening bid in a negotiation with the employee or the court over the agreement's unconscionable terms. As we have explained, "[b]ecause the employer drafted the arbitration agreement, the employer is saddled with the consequences of the provision as drafted." Spinetti, 324 F.3d at 217-18 n.2 (citation omitted). DI's efforts to defend the arbitrator selection clause are unavailing, and we conclude that the clause, like the five-day filing window and the provision requiring parties to bear their own fees, costs, and expenses, is substantively unconscionable.[5]

---

[5] Nino further contends that additional provisions of the agreement are likewise unconscionable. We do not find these additional provisions to be unreasonable, and we therefore mention them only briefly. First, Nino suggests that the agreement's provision requiring that the arbitration take place at DI's place of business is substantively unconscionable. Such provisions are not uncommon in arbitration agreements, see, e.g., Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1175 (10th Cir. 2007), and we do not agree that this term is

**D.**

Our final task in addressing Nino's unconscionability challenge to the arbitration agreement is to determine whether the unconscionable terms may be severed from the agreement such that the remainder of its terms may be enforced. As the Restatement (Second) of Contracts explains, where aspects of an agreement are unenforceable, "a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1). We have frequently emphasized that determining whether or not the unconscionable provisions of an arbitration agreement should be severed "requires more than a count of the unconscionable

---

unduly unfavorable to DI. Nino likewise argues that a provision in the agreement requiring the parties to evenly share the arbitrator's and stenographer's fees is unconscionable. In order to challenge such a provision, a plaintiff must show what the arbitrator's fees would likely amount to, and Nino made no such showing. See Alexander, 341 F.3d at 269. Finally, Nino takes issue with the agreement's requirement that "[t]he arbitrator . . . interpret, apply and be bound by the Employer's rules, regulations, policies and procedures as well as applicable federal, state, local and common law." (J.A. at 82.) Nino suggests that this provision requires the arbitrator to enforce DI's rules, even if those rules are unlawful. We do not agree—the agreement does not suggest that the arbitrator would be bound to enforce an unlawful employment policy.

-24-

provisions," and instead calls for an examination of the specific "nature of the provisions" themselves. Parilla, 368 F.3d at 286.

As we recognized most recently in Parilla, two lines of inquiry are relevant to the question of severability. The first of these is whether the unconscionable aspects "of the employment arbitration agreement constitute[] 'an essential part of the agreed exchange' of promises" between the parties. Spinetti, 324 F.3d at 214 (quoting Restatement (Second) of Contracts § 184(1)). If the unconscionable aspects of the clause do not comprise an essential aspect of the arbitration agreement as a whole, then the unconscionable provisions may be severed and the remainder of the arbitration agreement enforced. See id. "Whether the performance is an essential part of the agreed exchange depends on its relative importance in the light of the entire agreement between the parties." Restatement (Second) of Contracts § 184, cmt. a.

The second consideration for the question of severability, which we discussed in Alexander and elaborated upon in Parilla, is whether the unconscionability of the arbitration clause demonstrates "a systematic effort to impose arbitration on an employee, not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." Parilla, 368 F.3d at 288 (quoting Ferguson v. Countrywide Credit Indus., Inc., 298 F.3d 778, 787-88 (9th Cir. 2002)); see also Alexander, 341 F.3d at 271. Put differently, "a multitude of unconscionable provisions in an agreement to arbitrate will preclude severance and enforcement of arbitration if they evidence a deliberate attempt by an employer to impose an arbitration scheme designed to discourage an employee's resort to arbitration or to produce results biased in the employer's

-25-

favor." Parilla, 368 F.3d at 289; see also, e.g., Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1293-94 (9th Cir. 2006) (en banc); Hooters, 173 F.3d at 939-40; Graham Oil Co. v. ARCO Products Co., 43 F.3d 1244, 1248-49 (9th Cir. 1994). As we explained in Parilla, the principle of foreclosing severance where the contractual terms demonstrate a systematic effort to create a one-sided, employer-friendly forum is derived from the "equitable override provision of the Restatement." 368 F.3d at 288. Under that provision, even if "'disregard of [illegal provisions] will not defeat the primary purpose of the bargain,' enforcement of the bargain will be denied if the person seeking it has been 'guilty of serious moral turpitude,' Restatement (First) of Contracts § 603, or 'serious misconduct,' Restatement (Second) of Contracts § 184(1)." Id. at 289.

These two considerations provide separate and independent bases for declining to sever the unconscionable provisions from an arbitration agreement. That is, if the unconscionable provisions comprise essential aspects of the agreement as a whole, or if the agreement demonstrates that the employer sought to impose arbitration on the employee as an inferior, one-sided forum that worked to the employer's advantage, then severance of the unconscionable provisions is not called for, and the court should decline to enforce the arbitration agreement in its entirety. See id. at 288; Alexander, 341 F.3d at 270-71.

We need not discuss whether the unconscionable provisions of the parties' arbitration agreement comprise an essential aspect of the agreement as a whole, because we conclude that the one-sided nature of the arbitration agreement reveals unmistakably that DI "was not seeking a bona fide

-26-

mechanism for dispute resolution, but rather sought to impose a scheme that it knew or should have known would provide it with an impermissible advantage." Parilla, 368 F.3d at 289. The provisions in question do not simply accord an advantage upon DI indirectly or by happenstance. Instead, they are baldly one-sided, with only one discernable purpose—to create advantages for the employer that are not afforded to the employee. Of the four members of the arbitration panel, the agreement permits DI to strike two and the employee to strike just one. The employee is required to give notice to DI of the claims he intends to arbitrate, while DI is under no such obligation to provide any notice to the employee. The employee must file a detailed grievance regarding the matter he seeks to arbitrate within five days of the underlying events or lose the right to go to arbitration altogether, while DI is insulated against the risk of default for any failure to adhere to its own filing deadlines. These procedures provided DI with an "impermissible advantage," Parilla, 368 F.3d at 289, because they "unreasonably favor [DI] to the severe disadvantage of [its employees]." Alexander, 341 F.3d at 271. When the unconscionable arbitration provisions "are so one-sided that their only possible purpose is to undermine the neutrality of the proceeding," Hooters, 173 F.3d at 938 (emphasis added), severance of those provisions and enforcement of the remainder of the arbitration agreement is not appropriate. See Parilla, 368 F.3d at 289; Alexander, 341 F.3d at 271; Graham Oil, 43 F.3d at 1248-49. The only conceivable purpose of the arbitration agreement's one-sided provisions is to stack the deck in DI's favor, making severance of the unconscionable terms

-27-

inappropriate.[6]

We conclude, in sum, that the arbitration agreement is procedurally and substantively unconscionable, and that the pervasively one-sided nature of the agreement forecloses any possibility of severing the unfair provisions from the remainder of the agreement. See Alexander, 341 F.3d at 271 ("[W]e cannot give effect to an agreement to arbitrate afflicted by so much fundamental and pervasive unfairness.") We will thus

---

[6] We are unpersuaded by DI's argument that the agreement's unreasonable terms should be severed. DI likens this case to Parilla, in which we explained that a thirty-day filing provision and a requirement that arbitrating parties bear their own fees and costs were unconscionable. 368 F.3d at 277-79. As DI notes, rather than declining to enforce the agreement in Parilla, we remanded for further proceedings as to whether additional terms were unconscionable and whether severance of the unconscionable provisions was appropriate. Id. at 289. Here, we not only have a greater number of unconscionable terms than in Parilla, but, much more significantly, those terms demonstrate that DI created a one-sided arbitration system that gave it unfair advantages and that unreasonably restricted employees' access to arbitration. As we explained in Alexander, although "a district court should ordinarily be accorded the opportunity to rule on the issue of severance based on a sufficiently developed record," given the inescapably one-sided nature of this agreement, "no reasonable finder of fact could conclude that severance is appropriate." Alexander, 341 F.3d at 271 n.13.

reverse the District Court's decision to sever the unconscionable clauses from the arbitration agreement and enforce the remainder of the agreement.[7]

## IV.

As we now explain, we further conclude that the District Court erred in determining that DI did not waive its right to compel arbitration after litigating this case for fifteen months. "Consistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred, and waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068-69 (3d Cir. 1995) (internal quotations and citations omitted). Notwithstanding the preference for arbitration, however, "a court may refuse to enforce an arbitration agreement where, for example, 'the alleged defaulting party has acted inconsistently with the right to arbitrate,'" Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 981 (2d Cir. 1996) (quoting St. Mary's Medical Ctr. v. Disco Aluminum Prods. Co., 969 F.2d 585, 588 (7th Cir. 1992)), and

---

[7] In granting DI's motion, the District Court dismissed Nino's claims, rather than staying litigation pending the results of arbitration. We note that if the unconscionable terms had been severable from the arbitration agreement, the District Court should have stayed litigation in this case rather than dismissing Nino's claims. See 9 U.S.C. § 3; Lloyd v. HOVENSA, LLC., 369 F.3d 263, 268-69 (3d Cir. 2004) (explaining that § 3 directs courts to stay, not dismiss, cases when compelling arbitration).

-29-

"we will not hesitate to hold that the right to arbitrate has been waived where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration." Ehleiter, 482 F.3d at 223 (internal quotations and citations omitted).

In Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912 (3d Cir. 1992), we set forth "a nonexclusive list of factors relevant to the prejudice inquiry." Ehleiter, 482 F.3d at 222. The Hoxworth factors are:

> [1] the timeliness or lack thereof of a motion to arbitrate . . . [; 2] the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims; [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; [4] the extent of its non-merits motion practice; [5] its assent to the court's pretrial orders; and [6] the extent to which both parties have engaged in discovery.

Hoxworth, 980 F.2d at 926-27 (internal citations omitted). As is evident by our repeated characterization of these factors as a nonexclusive list, not all the factors need be present to justify a finding of waiver, and "[t]he waiver determination must be based on the circumstances and context of the particular case." Doctor's Assocs., 85 F.3d at 981.

We have, moreover, consistently emphasized that "prejudice is the touchstone for determining whether the right to

-30-

arbitrate has been waived by litigation conduct." Ehleiter, 482 F.3d at 222 (quotations and citations omitted). As the Hoxworth factors themselves make clear, the concept of prejudice includes not only "substantive prejudice to the legal position of the party claiming waiver," but also extends to "prejudice resulting from the unnecessary delay and expense incurred by the plaintiffs as a result of the defendants' belated invocation of their right to arbitrate." Id. at 224. For example, we stated in Hoxworth that:

> [W]here a party fails to demand arbitration during pretrial proceedings, and, in the meantime, engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing arbitration may more easily show that its position has been compromised, i.e., prejudiced, because under these circumstances we can readily infer that the party claiming waiver has already invested considerable time and expense in litigating the case in court, and would be required to duplicate its efforts, to at least some degree, if the case were now to proceed in the arbitral forum. Prejudice of this sort is not mitigated by the absence of substantive prejudice to the legal position of the party claiming waiver.

Id. (internal quotations and citations omitted). In other words, the investment of considerable time and money litigating a case may amount to sufficient prejudice to bar a later-asserted right to arbitrate. This recognition that the right to arbitrate may be waived under such circumstances is consistent with the purpose behind arbitration itself—arbitration is meant to streamline the proceedings, lower costs, and conserve private and judicial

-31-

resources, and it furthers none of those purposes when a party actively litigates a case for an extended period only to belatedly assert that the dispute should have been arbitrated, not litigated, in the first place.

In rejecting Nino's argument that DI had waived its right to enforce the arbitration clause, the District Court focused almost exclusively on two of the six Hoxworth factors: the fact that, by including mandatory arbitration among the ten affirmative defenses asserted in the answer, DI had "informed its adversary of the intention to seek arbitration," and the fact that DI had not filed a dispositive motion prior to moving to enforce the arbitration agreement. Hoxworth, 980 F.2d at 926-27. As we now explain, in emphasizing these factors, the District Court gave insufficient consideration to the remaining Hoxworth factors, and, consequently, to the more practical question of whether DI has "acted inconsistently with the right to arbitrate." St. Mary's, 969 F.2d at 588. We conclude that DI, through its litigation conduct, waived its right to compel arbitration of Nino's claims. We address the six Hoxworth factors in turn below.

## A. The Timeliness of DI's Motion

The first Hoxworth factor requires that we consider whether DI moved to compel arbitration on a timely basis. 980 F.2d at 926-27. Although "the length of the time period involved alone is not determinative," Zimmer, 523 F.3d at 232 (citation omitted), and although we have addressed instances of more serious untimeliness, see Ehleiter, 482 F.3d at 223 (characterizing a four-year delay as especially "egregious"), DI manifestly did not move to compel arbitration in a timely

-32-

manner, and this factor weighs firmly in favor of waiver. As in Ehleiter, the fifteen-month delay in this case substantially "exceeds the eleven month time lapse at issue in Hoxworth, and dwarfs the delay involved in cases where we have found no waiver. See Palcko (38 days); Wood (1 1/2 months); Faragalli, 61 F.3d at 1069 (two months); Gavlik (defendant moved for stay pending arbitration "immediately" after removing the action to federal court)." Ehleiter, 482 F.3d at 223.

Moreover, to the extent that our review of the motion's timeliness should consider the movant's explanation for its delay, DI's stated rationale for having waited so long to seek to enforce the arbitration agreement is utterly unconvincing. DI explains that it delayed filing a motion to enforce the arbitration agreement because Nino's complaint alleged that Nino and DI had signed a new contract updating the terms of Nino's compensation; "DI had difficulty in locating this document"; and it was not until Nino's July 25, 2007 deposition that DI understood that the complaint's reference to a new contract was, in fact, a reference to a letter of understanding that amended Nino's prior contract. (DI Br. 24.)

No aspect of this explanation withstands scrutiny. First, while the complaint indeed refers to a May 22, 2002 agreement between Nino and DI to modify the terms of his compensation, the complaint certainly does not suggest that this subsequent agreement in any way addressed or modified the original contract's arbitration agreement. DI's contention that the complaint led it to believe that the parties had somehow altered their arbitration agreement is unconvincing, as nothing in the complaint's language supports such an inference. Second, if DI had in fact experienced difficulty in locating the contract it

-33-

drafted and in assessing its impact upon the parties' arbitration agreement, it could (and presumably would) have propounded interrogatories to Nino to clarify which contract the complaint referred to and whether that contract had, in fact, affected the arbitration agreement;[8] DI's interrogatories do not mention the contract in question, undercutting DI's explanation for its delay. Third, on November 20, 2006, as part of its discovery production in this case, DI produced the very document it now claims not to have been able to locate. Finally, notwithstanding its explanation that it was not until Nino's July 25, 2007 deposition that DI understood which contract the complaint was referring to, DI still did not move to enforce the arbitration agreement for another two months after the deposition. In short, DI's delay was significant, and its explanations for the delay are unpersuasive. The first Hoxworth factor thus weighs heavily in favor of a finding of waiver.

## B. Whether DI Contested the Merits of Nino's Claims

We next consider "the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims." Hoxworth, 980 F.2d at 926. DI is correct that this factor weighs against a finding of waiver, as it did not engage in motion practice on the merits prior to moving to compel arbitration. Although Nino argues that this factor tilts in his favor because DI filed a motion to dismiss one of his claims at the same time that it filed its motion to compel arbitration, and

_____

[8] The complaint states that DI refused to provide Nino with a copy of this agreement, and so DI admittedly could not ask that Nino produce the agreement during discovery.

that Nino's counsel received the dismissal motion two days before receiving the motion to compel arbitration, Nino was not seriously prejudiced by having received the dismissal motion just two days before the motion to compel arbitration.

## C. Whether DI Informed Nino of its Intent to Seek Arbitration

The third Hoxworth factor is whether the party seeking arbitration "has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings." 980 F.2d at 926-27. The District Court relied primarily upon this factor in its analysis, reasoning that because DI included mandatory arbitration among the ten affirmative defenses asserted in its answer, it had provided Nino with adequate notice of the fact that it would eventually move to enforce the arbitration agreement. According to the District Court, "[a]fter the defendants raised the affirmative defense of arbitration in their answer, Nino was on notice that arbitration may be forthcoming and had the opportunity to plan his litigation strategy accordingly." (J.A. at 23.)

While DI is correct that this factor weighs in its favor, the District Court's analysis overstates its significance in this case. It is undoubtedly true that DI's answer disclosed the possibility that it would seek to compel arbitration, and that this disclosure is an important consideration, although it is by no means a dispositive one, for the waiver analysis. Hoxworth, 980 F.2d at 926-27.

However, the significance, for purposes of the waiver analysis, of DI's invocation of arbitration in its answer decreased the longer DI participated in this litigation without

-35-

further invoking or even mentioning the prospect of arbitration. Contrary to the District Court's reasoning that Nino could strategize around the initially disclosed prospect of arbitration, a party's capacity to develop a litigation strategy with regard to the likelihood of arbitration diminishes the longer the case is litigated with no further indication that a motion to compel arbitration is forthcoming. Cf. Thyssen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 105 (2d Cir. 2002) ("[W]aiver is more likely to be found the longer the litigation goes on, the more a party avails itself of the opportunity to litigate, and the more that party's litigation results in prejudice to the opposing party[.]"). A party's approach to discovery, for instance, will differ based upon whether the case is to be litigated or arbitrated.[9] Likewise, although we have concluded the arbitration clause's ban on attorney's fees is unconscionable, Nino could not have known that outcome as the case was being litigated, and his litigation strategy was thus almost certain to differ based upon whether the case was being litigated in court (where an award of attorney's fees was available) or arbitrated (where, on paper at least, such an award was unavailable). In the waiver context, where prejudice to the non-movant is the

---

[9] It is well recognized that "discovery generally is more limited in arbitration than in litigation," In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 286 (4th Cir. 2007), and that, as an "important counterweight[,] . . . arbitrators are not bound by the rules of evidence," Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991). Consequently, a party's evidentiary and discovery needs will be substantially different depending upon whether a case is to be litigated or arbitrated.

-36-

key, an initial invocation of the defense of arbitration becomes less significant the longer and more actively a party litigates after having made that initial invocation without making any further mention of arbitration.[10] In short, the affirmative defense contained in DI's answer to the complaint "informed [Nino] of the intention to seek arbitration," Hoxworth, 980 F.2d at 926-27, but the significance of this notice diminished the longer DI delayed in moving to compel arbitration.

## D. Extent of Non-Merits Motion Practice

Under Hoxworth, we also consider the non-merits motion practice that transpired in this case during the fifteen-month period between when DI was served with the complaint and when it filed its motion to compel arbitration. Id. Significantly, here the non-merits motion practice is equivalent to that in Hoxworth, in which the defendant was found to have waived its right to compel arbitration—as in Hoxworth, DI "inadequately answered [Nino's] discovery requests," requiring Nino to file three detailed motions to compel, which DI opposed. Id. at 925. And as in Hoxworth, the consequence of the parties' motion practice over these discovery disputes was to require Nino to "devote[] substantial amounts of time, effort, and money in prosecuting the action." Id. at 926 This factor weighs strongly in favor of a finding of waiver.

## E. DI's Assent to the Court's Pretrial Orders

Also significant is the fact that DI "assent[ed] to the

---

[10] Put more succinctly, at some point a party seeking to enforce an arbitration agreement must use it or lose it.

[trial] court's pretrial orders," id. at 926-27, an important consideration that the District Court failed to address in its resolution of the waiver issue.  In the fifteen months between June 2006 and September 2007, the magistrate judge convened no fewer than ten pretrial conferences.  DI does not dispute Nino's contention that it did not even mention the prospect of arbitration at any of these conferences, nor did it object to any of the magistrate judge's pretrial orders based upon its intent to compel arbitration.  While the case-specific waiver analysis is not susceptible to precise line-drawing, certainly DI's participation in ten pretrial conferences over the course of fifteen months shows unmistakably that it "acted inconsistently with the right to arbitrate."  St. Mary's, 969 F.2d at 588; see Restoration Preservation Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 61 (1st Cir. 2003) (noting, inter alia, the expense plaintiffs incurred in participating in thirteen pretrial conferences in concluding that defendant waived right to compel arbitration).

The authorities upon which DI relies do not compel a contrary conclusion.  DI draws our attention to Maxum Found., Inc. v. Salus Corp., 779 F.2d 974, 983 (4th Cir. 1985), and, in particular, to that court's observation that "the party seeking arbitration does not lose its contractual right by prudently pursuing discovery in the face of a court-ordered deadline."  DI appears to overlook the context in which the court made the cited statement.  In Maxum, the plaintiff argued that the defendant waived its right to seek arbitration because the defendant participated in discovery and pretrial conferences after it had filed its motion to compel arbitration, but before the trial court ruled on the motion.  Id. at 982-83.  There was no

-38-

inconsistency between the defendant's litigation conduct and its intent to arbitrate in that case, because the litigation conduct in question transpired after the defendant had demanded arbitration. In our case, by contrast, DI participated actively in the litigation for well over a year before moving to compel arbitration, meaning that its pursuit of discovery and its assent to pretrial orders is not remotely comparable to the conduct at issue in Maxum.[11] DI's long-term assent to the magistrate judge's pretrial orders weighs heavily in favor of a finding of waiver.

## F. Extent to Which Both Parties Engaged in Discovery

Finally, the parties engaged in significant discovery during the fifteen-month period before DI filed its motion to compel arbitration. During this time the parties conferred and prepared a proposed case management order which contained no mention of arbitration, propounded interrogatories, served and supplemented disclosures, exchanged requests for document production, and attended the depositions of four witnesses. Additionally, as was noted supra, Nino expended additional

---

[11] American Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88 (4th Cir. 1996), also cited by DI, is likewise readily distinguishable from the facts of our case. In that case, the defendant invoking arbitration participated in discovery during the two-month period between the commencement of the lawsuit and the filing of the defendant's motion to compel arbitration. DI litigated this case and assented to the trial court's pretrial orders for thirteen months longer than did the defendant in American Recovery.

-39-

resources on discovery-related matters as a result of DI's inadequate responses to his discovery requests, which resulted in significant discovery-related motion practice. While the scope of the parties' discovery during the fifteen-month period at issue in this case was not as extensive as the discovery at issue in Hoxworth and Ehleiter, the discovery in this case was by no means de minimis.

DI, in arguing that the parties' discovery-related activities do not demonstrate that it engaged in pretrial activity inconsistent with an intent to arbitrate, notes that the parties' arbitration agreement authorizes the parties to conduct discovery "pursuant to the Federal Rules of Civil Procedure." (J.A. at 81.) In light of Hoxworth's finding that the plaintiffs in that case had been prejudiced by the fact that, in litigating the case in court, the "defendants were able to use the Federal Rules to conduct discovery not available in the arbitration forum," Hoxworth, 980 F.2d at 926, DI contends that there could be no prejudice in this case, since discovery would have been available in the arbitral forum.

The force of this argument is undermined, however, by the arbitration agreement's firm requirement that the arbitration take place "in no event more than thirty (30) days after the selection of an arbitrator has been made." (J.A. at 81.) That is, while the parties would undoubtedly have had some opportunity for discovery had the arbitration clause been invoked on a timely basis, the time constraints placed upon such discovery would have been much more restrictive, and, by consequence, the resources expended on discovery would have been much more limited. See Restoration Preservation Masonry, 325 F.3d at 61. The mere fact that some discovery would have been available in

-40-

arbitration does not mean that Nino was not prejudiced by having to participate in fifteen months' worth of discovery in federal court before DI elected to move to compel arbitration. The extent of the parties' discovery between June 2006 and September 2007 weighs firmly in favor of a finding of waiver.

## G. Summary

In summary, four of the Hoxworth factors—the untimeliness of DI's motion, the extent of non-merits motion practice, DI's assent to the magistrate judge's pretrial orders, and the extent of the parties' discovery—weigh firmly in favor of a finding of waiver. Of the two factors that do not tip decisively against DI's right to belatedly invoke the arbitration clause—the fact that DI did not engage in merits-based motion practice and the fact that DI listed arbitration as an affirmative defense—the District Court relied most heavily upon DI's inclusion of arbitration in its answer to the complaint. As we have explained, however, the significance of this factor diminished the longer DI litigated this case without raising the prospect of arbitration.

The fifteen-month delay between the service of the complaint and DI's invocation of arbitration was significant, see Ehleiter, 482 F.3d at 223, and DI's delay "caused [Nino] the expense of litigating in court, as well as . . . making [Nino] endure [fifteen months] of what would have been (had [DI] succeeded) wasted litigation." St. Mary's, 969 F.2d at 591; see also Ehleiter, 482 F.3d at 222 (such expense and delay constitute prejudice). While we are mindful of the fact that "waiver is not to be lightly inferred," it is not appropriate to compel arbitration where, as here, "the demand for arbitration came long after the

-41-

suit commenced and when both parties had engaged in extensive discovery." PaineWebber Inc., 61 F.3d at 1068-69 (internal quotations and citations omitted).

## V.

For the foregoing reasons, we will reverse the District Court's order compelling arbitration and remand for further proceedings.