Cataldo **PIRITO**

v.

**PENN ENGINEERING WORLD HOLDINGS, et al.**

Civil Action No. 09–2396.

United States District Court,
E.D. Pennsylvania.

Dec. 22, 2011.

Colin R. Robinson, Saiber, LLC, Newark, NJ, GianClaudio Finizio, Stephen B. Brauerman, Vanessa R. Tiradentes, Bayard, PA, Wilmington, DE, for Plaintiff.

Richard G. Placey, Julie H. Chelius, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, for Defendants.

*MEMORANDUM*

DALZELL, District Judge.

Plaintiff and counterclaim defendant Cataldo Pirito ("Pirito") brings this action

against defendants and counterclaim plaintiffs Penn Engineering World Holdings ("Penn World") and Penn Engineering & Manufacturing Corp. ("Penn Engineering," and collectively, the "Penn entities"), asserting two claims for breach of contract— one against each defendant. These claims arise out of a Share Purchase Agreement (the "Agreement") executed in January of 2003 whereby Penn World purchased from Pirito the outstanding capital stock of Maelux SA, a Luxembourg corporation that owned all of the capital stock of M.A.E. S.p.A., an Italian corporation.

Pirito alleges that Penn World and Penn Engineering (which executed a Guarantee that Penn World would perform under the Agreement) failed to sell certain real property in Offanengo, Italy to Pirito upon his exercise of an option to purchase this property, as the Agreement required. The Penn entities counter with four claims of their own against Pirito: for (1) fraud; (2) breach and lapse of the option to purchase real property; (3) enforcement of the determination of an independent public accountant; and (4) breach of contract. The Penn entities allege that Pirito misrepresented the financial condition of Maelux SA and M.A.E. S.p.A. in violation of the Agreement.

Though Pirito filed this action in May of 2009, we stayed these proceedings for much of the ensuing time to permit the parties to try to resolve this complex dispute under the good offices of Judge Jacob P. Hart. When these discussions failed, we restored the case to our active docket and the parties promptly started a flurry of motion practice. We now have before us four fully briefed motions: (1) the Penn entities' motion for costs; (2) Penn World's petition to confirm arbitration award; (3) Pirito's motion to dismiss for lack of jurisdiction; and (4) the Penn entities' motion for partial summary judgment.

For the reasons set forth at length below, we will grant the Penn entities' motion for costs in part and Penn World's petition to confirm arbitration award in part. We will deny Pirito's motion to dismiss and the Penn entities' motion for summary judgment.

## I. *Factual and Procedural Background*

For the reasons later detailed, we will resolve the pending motions without considering in depth the merits of the parties' claims. Instead, our decisions depend upon the language of the January, 2003 Agreement and the procedural history of the parties' efforts to arbitrate this dispute in Italy. We will thus recite the undisputed facts as to the Agreement itself and recount the arbitration proceedings initiated before the Chamber of National and International Arbitration of Milan (the "Chamber") on March 20, 2008.

Our decision will make more sense when it is placed in the context of the parties' allegations as to their performances under the Agreement and the outcome of an arbitration initiated before the Chamber in January of 2005—though the parties display little agreement on these topics. We will therefore rehearse the parties' main averments as to these topics, though we need not decide which averments to credit in resolving the pending motions.

### A. *The Undisputed Facts As To The Agreement*

Pirito, an Italian citizen, resides in Brazil, Pl.'s Compl. ¶ 2; Defs.' Countercls. ¶ 1, while Penn Engineering is a Delaware corporation with its principal place of business in Danboro, Pennsylvania, Defs.' Countercls. ¶ 6; Pl.'s Ans. to Defs.' Countercls. ("Pl.'s Ans.") ¶ 6. Penn World is a Bermuda limited partnership, whose General Partner is Penn Engineering Holdings, Inc., Defs.' Countercls. ¶¶ 7, 9; Pl.'s

Ans. ¶¶ 7, 9. Penn Engineering Holdings, Inc. is a wholly-owned, direct subsidiary of Penn Engineering. Defs.' Countercls. ¶ 8; Pl.'s Ans. ¶ 8.

On January 23, 2003, Pirito and Penn World entered into an Agreement whereby Penn World purchased from Pirito all of the capital stock of Maelux SA. Pl.'s Compl. ¶¶ 8–9; Defs.' Countercls. ¶¶ 16–17. The Agreement provided that "[t]he Buyer agrees to pay to the Seller, subject to adjustment as provided in Section 2(d), a purchase price (the 'Purchase Price') by delivery of (i) cash in the amount of €7,000,000 payable to the Seller by wire transfer or delivery of other immediately available funds, [and] (ii) cash in the amount of €2,000,000 payable to the Escrow Agent by wire transfer or delivery of other immediately available funds," as well as enough funds to satisfy in part a loan that Maelux SA had taken out and an earn-out to be paid to Pirito over four years. Ex. A.1 to Defs.' Countercls. ("Agreement") § 2(b).

The Agreement established an elaborate mechanism for determining the consolidated net worth of Maelux SA after the closing, *id.* § 2(d), and this mechanism proved sufficiently important during the proceedings in which the parties later participated that we will quote the relevant language of the Agreement at length:

> Immediately after the consummation of the Closing hereunder the Buyer shall, at the Buyer's expense, engage Ernst & Young LLP to prepare an audited consolidated balance sheet of the Company (the "Closing Statement") and determine the consolidated net worth (i.e., total assets minus total liabilities) of Maelux (including the Company) as of the close of business on the business day immediately preceding the Closing Date ("Net Worth"), which shall be prepared in accordance with Italian Accounting Principles applied on a consistent basis for all periods subject to the accounting standards more fully described on Appendix G. Ernst & Young LLP shall be required to deliver the Closing Statement to the Buyer not later than 90 days after the Closing Date. Promptly after the Buyer's receipt thereof, the Buyer shall deliver a copy of the Closing Statement to the Seller. Upon receipt of the Closing Statement, the Seller shall give written notice to the Buyer within 30 days if the Seller disputes the Closing Statement and the parties shall negotiate in good faith to resolve such dispute.... If the Buyer and the Seller are unable to resolve such dispute within 15 days after the Buyer is notified thereof, the disputed matters shall be referred to an independent public accountant satisfactory to the Buyer and the Seller, who shall be directed to determine the Net Worth of the Company as of the close of business on the business day immediately preceding the Closing Date and the determination of such accountant shall be binding on the parties hereto. If the Buyer and the Seller are unable to agree upon an independent public accountant, the Buyer and the Seller shall each designate an independent public accountant, who shall choose the independent public accountant that will finally determine the Net Worth of the Company as of the close of business on the business day immediately preceding the Closing Date. The Buyer and the Seller shall each pay one-half of the cost of the services of such independent accountant. If and to the extent that the Net Worth of the Company reflected on the Closing Statement as finally determined ("Net Worth at Closing") shall be an amount less than €815,821 ("Minimum Required Net Worth"): (i) the Purchase Price shall be retroactively and immediately reduced by an amount

equal to the amount ("Net Worth Deficit") by which the Net Worth at Closing is less than the Minimum Required Net Worth, and (ii) an amount equal to the Net Worth Deficit shall become immediately due and payable to the Buyer from the Seller, such amount being payable first from the Escrow, and, if in excess of the Escrow, then by the Seller.

The Agreement envisioned the prospect that Pirito would purchase the "Real Property," meaning "land and buildings owned by the Company in Offanengo, Italy," *id.* at 4, from Penn World following the closing. Thus, the Agreement provided that "[u]pon delivery of a written notice" to the Seller or the Buyer "not less than 60 days prior to the third anniversary of the Closing Date," "the Seller shall be obligated to purchase the Real Property from the Company" and "the Buyer shall be obligated to cause the Company to sell the Real Property by the Seller" on the third anniversary of the closing date. *Id.* § 2(f)(i)-(ii). Under the Agreement, however, "[i]n the event there are outstanding amounts owed at the end of the three-year period by the Seller to the Buyer for any matter with respect to this Agreement ... the Real Property Payment Amount will be increased by such amounts, provided, however, that no increase will be made for amounts for which a claim is pending under the Escrow Agreement." *Id.* § 2(f)(vii).

The Agreement contained Pirito's representations that, (among other things): (1) certain financial statements attached to the Agreement "present fairly the financial condition of the Company and Maelux," *id.* § 4(d); (2) M.A.E. S.p.A. "has no liability ... except for (i) liabilities set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) liabilities that have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business," *id.* § 4(f); (3) "Maelux's sole assets are, and has [*sic*] been since its incorporation, the Company Shares. Except for owning the Company Shares, Maelux has never conducted any business activity," *id.* § 4(k); and (4) "[t]he inventory of the Company ... is merchantable and saleable in the Ordinary Course of Business ... and, except as set forth on Appendix H or Appendix I, none of which is Slow Moving Inventory or Obsolete Inventory." *Id.* § 4(*l*).

Finally, with respect to the resolution of disputes, § 13(h) states that "[t]his Agreement shall be governed by and construed in accordance with the laws of Italy without giving effect to any choice or conflict of law provisions or rules that would cause the application of the laws of any jurisdiction other than Italy." Section 13(m) further provided that

> Except for disputes concerning the preparation of the Closing Statement and any reduction of the Purchase Price under Section 2(d), which shall be resolved in accordance with such Section 2(d), any other dispute arising under the indemnification provisions or any other provisions of this Agreement or the Real Property Agreement, including those concerning their validity, interpretation, performance and termination, shall be referred to an arbitral tribunal in Milan, Italy, or such other place agreed by the Parties hereto .... Judgment may be entered in any court of competent jurisdiction based upon the decision reached in such arbitration.

On the same day that Pirito and Penn World entered into the Agreement, Penn Engineering executed a Guarantee, Pl.'s Compl. ¶ 11; Defs.' Ans. ¶ 11, under which

> Penn Engineering & Manufacturing Corp. ("Parent") irrevocably guarantees each and every representation, warranty, covenant, agreement and other obli-

gation of the Buyer, and/or any of its permitted assigns (and where any such representation or warranty is made to the knowledge of the Buyer, such representation or warranty shall be deemed made to the knowledge of Parent), and the full and timely performance of their respective obligations under the provisions of the foregoing Agreement.

Ex. B to Pl.'s Compl. ("Guarantee") at 1.

### B. *The Parties' Allegations as to Performance*

Both Pirito and the Penn entities contend that following the closing of the transaction described in the Agreement, the other party or parties violated it. The Penn entities also claim that Pirito's conduct leading up to the closing constituted fraud.

Pirito alleges that on February 22, 2007, he notified Penn World of his decision to exercise his option to purchase the Real Property under § 2(f)(ii) of the Agreement, Pl.'s Compl. ¶ 23, but that Penn World responded "that Plaintiff would only be able to take title to the Real Property if Plaintiff agreed to pay an additional €2,994,509 / $4,087,265 USD, which Defendant Penn World's counsel, Mr. Dreher, claimed Plaintiff owed Defendant, Penn World." *Id.* ¶ 27. According to Pirito, "[u]nder the terms of the Agreement governing the sale of the Real Property, no term requires the payment of these additional monies to Defendant Penn World." *Id.* ¶ 32.

The Penn entities, for their part, assert that "[o]n July 2, 2003 Penn World gave Pirito notice of the Closing Statement provided by Ernst & Young, consisting of the Audited Balance Sheet of M.A.E. as of February 5, 2003, finding that M.A.E.'s Net Worth was a negative €442,000 and the Net Worth Deficit was approximately €1,258,000." Defs.' Countercls. ¶ 96. The Penn entities further allege that "[a]fter years of delay by Pirito, in October 2007, an independent public accountant, Dr. Marcello Del Prete .... determined that the Net Worth was *negative* €669,856 as of February 5, 2003—not €815,821 as represented by Pirito." *Id.* ¶ 48. The Penn entities contend that Pirito misrepresented the Net Worth in the Agreement, *id.* ¶ 49, and further aver that Pirito misrepresented M.A.E. S.p.A.'s income and profit, *id.* ¶ 51, and the "warehouse value," which presumably refers to M.A.E. S.p.A.'s inventory, *id.* ¶ 52—all in violation of the Agreement. The Penn entities also claim that in the spring of 2005 Pirito filed a lawsuit against Maelux SA to collect a €514,000 debt he claims Maelux SA owed him that he had created and that he had not disclosed to the Penn entities. *Id.* ¶¶ 80–83. According to the Penn entities, the existence of this debt contradicted certain of Pirito's representations in the Agreement, including that "Maelux did no business other than own the M.A.E. stock." *Id.* ¶ 79.

### C. *The Parties' Allegations As To The First Arbitration*

According to the Penn entities, Pirito's counsel contested Ernst & Young's Net Worth Deficit calculation in July of 2003, Defs.' Countercls. ¶ 99, and the Penn entities attempted to resolve this dispute with Pirito from late July of 2003 until January of 2004. *Id.* ¶ 104. When Pirito refused to identify an independent accountant pursuant to § 2(d) of the Agreement, however, *id.* ¶ 133-34, the Penn entities initiated an arbitration proceeding (the "First Arbitration") in the Chamber in January of 2005. *Id.* ¶ 135; Pl.'s Compl. ¶ 35.

The Penn entities claim that before the First Arbitration panel Pirito interposed a number of challenges to the panel's jurisdiction, the validity of the Agreement, and

the manner in which Penn World had served him with Ernst & Young's closing statement. *Id.* ¶ 136. According to the Penn entities, in February of 2007 the Panel issued a Partial Determination "rejecting Pirito's claims that: the Arbitration Panel was not competent under the Agreement to make any decision with respect to the validity, interpretation or execution of the Net Worth provision in the Agreement; that the Net Worth provision was void and the service of the Closing Statement was untimely." *Id.* ¶ 137. The Panel, however, "found that it did not have the power to appoint an independent public accountant," *id.*, leading Penn World to file a petition in the Court of Milan on February 22, 2007 to appoint such an accountant. *Id.* ¶ 138; Pl.'s Ans. ¶ 138.

The Penn entities aver that in mid–2007, the Court of Milan "appointed Dr. Marcello Del Prete as the independent public accountant to determine the Net Worth Deficit." *Id.* ¶ 140. The parties agree that "[i]n early October 2007, Dr. Del Prete issued his report finding that the Net Worth of the Consolidated Financial Statement of Maelux was a *negative* €669,856 and that the Net Worth Deficit was €1,485,687." *Id.* ¶ 142; Pl.'s Ans. ¶ 142. Pirito maintains, however, that "the independent public accountant's report was seriously flawed and did not accurately calculate the Net Worth value." *Id.* In October of 2007, Penn World sought to have the First Arbitration panel consider Del Prete's report. Defs.' Countercls. ¶ 148; Pl.'s Ans. ¶ 148.

If the Penn entities believe that they found some vindication before the First Arbitration panel, Pirito, too, alleges that he was vindicated. According to Pirito, on February 1, 2008, "[t]he Arbitration Panel rejected Defendant Penn World's position" that "it had a right to demand that Plaintiff pay an additional €3,000,000 / $4,094,760 USD to Defendant before conveying title to the Real Property as a 'guarantee' that other allegedly outstanding amounts owed by Plaintiff would be paid." Pl.'s Compl. ¶ 39. Pirito further contends that "[t]he first Arbitration Panel refused to consider Mr. Del Prete's findings because it concluded that the issue of price adjustment could not be adjudicated as an arbitration matter." Pl.'s Ans. ¶ 149. The Penn entities disagree, maintaining that the Panel "did not consider Dr. Del Prete's findings" merely due to "Pirito delaying the appointment of Dr. Del Prete and delaying and hindering the completion of his report." Defs.' Countercls. ¶ 149. Penn World thus filed a second request for arbitration (the "Second Arbitration") before the Chamber on March 20, 2008. Penn World's Pet. to Confirm Arb. Award ("Def.'s Pet.") ¶ 11; Pl.'s Resp. to Def.'s Pet. ¶ 12.

### D. *The Undisputed Facts As To The Second Arbitration*

On February 13, 2009—shortly before the parties filed their pleadings in this action—the Chamber filed a Partial Award on Jurisdiction in the Second Arbitration. Defs.' Pet. at 4 n. 1; Pl.'s Resp. to Def.'s Pet. ¶ 13. In the Partial Award, a majority of the arbitral panel concluded that "[t]he Tribunal has jurisdiction on the claim of the Claimant for the Net Worth Deficit as formulated in the Request for Arbitration." Ex. C to Def.'s Pet. at 25. One arbitrator dissented, explaining that "the First Tribunal held that it lacked jurisdiction on *all* claims relating to price reduction pursuant to Article 2(d) SPA," *id.* at 8[1] (emphasis in original), and that

---

1. Though Penn World presents the majority and dissenting opinions in the Second Arbitration Panel's Partial Award in a single exhibit, the opinions have been separately pag-

"[t]he First Tribunal's decision on jurisdiction—and more specifically on the interpretation of the Arbitration Clause in relation to the issue of price reduction—is final, it is *res judicata.*" *Id.* at 9. The dissenting arbitrator thus concluded that "the finding of the majority that our Tribunal has jurisdiction over the Claim is . . . in contrast with the decision on jurisdiction of the First Tribunal which is final and binding," and that "[o]ur Tribunal should therefore have declined jurisdiction over the Claim." *Id.* at 11.

On September 18, 2009—after Pirito had filed his complaint and the Penn entities had filed their counterclaims, but before Pirito answered these counterclaims—the Second Arbitration panel issued a Final Award. Def.'s Pet. ¶ 14; Pl.'s Resp. to Def.'s Pet. ¶ 14. The panel noted that Penn World had submitted three prayers for relief, Ex. B to Def.'s Pet. ¶ 52 (quoting Penn World's Ex. C–5 at 13):

"1. Condemn the Respondent to pay the amount of € 1,485.677, deriving from the determination of Mr Del Prete, with interest from the 5th February 2003 to the moment of payment at the applicable Rate (Euribor at one month) . . . .

2. Condemn the RESPONDENT to pay the amount of € 40,935.66 for the 50% of the costs of Mr Del Prete (plus interest from the date of the invoice of Mr Del Prete) and € 150,-000—for legal costs for the proceedings *in volontaria girisdizione;*

3. Condemn the RESPONDENT to pay all the costs of these proceeding [*sic* ]."

The Second Arbitration Panel concluded that "[t]he conclusions of the Del Prete

Report are valid, final and binding upon the Parties," *id.* ¶ 116, and thus decided as follows, *id.* at 32:

1. Mr. Cataldo Pirito shall pay to Pennengineering World Holdings LP the amount of € 1.485,677 plus interest at the Euro Libor (one month) as reported in the Wall Street Journal as from 5 February 2003 until full and complete payment;

2. Mr. Cataldo Pirito shall pay to Pennengineering World Holdings LP the amount of € 40,935.66 as participation to Mr Del Prete costs and fees, plus interest at the legal rate as from 9 January 2008 until full and complete payment;

3. Mr. Cataldo Pirito shall pay to Pennengineering World Holdings LP the amounts of:

 (i) € 50,000 as compensation for costs and fees incurred in connection with the procedure of *Volontaria Giurisdizione;*

 (ii) € 60,000 as compensation for costs and fees incurred in connection with the arbitration proceedings;

 (iii) € 105,269.31 as participation to the arbitration costs.

4. Any and all other claims by the Parties are dismissed.

Pirito states that he

 has appealed the Partial Award on Jurisdiction and Final Award II (collectively, the 'Appeal'), which are currently pending. A hearing with respect to the Appeal is currently scheduled for September 18, 2012; however, Pirito is attempting to expedite the matter.

Pl.'s Resp. to Def.'s Pet. ¶ 15. The Penn entities concede that Pirito has lodged this appeal, *see, e.g.,* Defs.' Br. in Supp. of Mot.

inated. Thus, a pagination reference to the exhibit may denote either of two different pages. Where we refer to the dissenting opinion, we use its separate pagination; these numbers do *not* refer to the majority opinion.

for Summ. J. ("Defs.' MSJ Br.") at 13 n. 9 ("Pirito appealed the finding of jurisdiction to the Milan Court of Appeal."), though they ironically note that "[i]f Pirito has made any arrangement to expedite the appeal, he has not shared that fact with Penn World's counsel of record in Italy." Def.'s Reply in Supp. of Def.'s Pet. at 6.

## II. *Analysis*

Rather than address the pending motions in the order they were filed, we will consider them in a more logical sequence: (1) Pirito's motion to dismiss for lack of jurisdiction; (2) Penn World's petition to confirm arbitration award; (3) the Penn entities' motion for summary judgment; and (4) the Penn entities' motion for costs.

### A. *Pirito's Motion to Dismiss for Lack of Jurisdiction*

Pirito notes that the Agreement between him and Penn World "includes an arbitration clause, making all disputes concerning the 'validity, interpretation, performance and termination' of the SPA subject to arbitration," Pl.'s Mot. to Dismiss at 2 ("Pl.'s MTD") (quoting Agreement § 13(m)), though he concedes that Penn Engineering's Guarantee "does not contain an arbitration provision." *Id.* at 3 (citing Guarantee). Pirito further observes that he "filed his Answer to the Counterclaims on September 28, 2009, wherein he asserted several affirmative defenses, including that 'Counts I–IV are improper in this forum and should be dismissed since Counts I–IV are subject to the arbitration provisions of Section 13(m) contained in the Share Purchase Agreement.' " *Id.* at 6 (quoting Pl.'s Ans. at 19). He thus contends that "[t]he Court should dismiss the Counterclaims because: (i) the Counterclaims asserted by Defendants are subject to arbitration pursuant to Section 13(m) of the SPA to which the parties expressly agreed; and (ii) Pirito has not waived his right to enforce the arbitration clause." *Id.* at 7.

Penn Engineering responds that although the Agreement included an arbitration clause, "Penn Engineering was not a party to that Agreement." Penn Eng'g's Resp. to Pl.'s MTD at 1 (emphasis omitted). Since "[t]he Guarantee does not include an arbitration agreement, and indeed, Pirito's Motion makes no claim that there is any arbitration agreement with Penn Engineering," Penn Engineering urges that "Pirito's Motion should be summarily denied as to Penn Engineering." *Id.* at 2.

As for Penn World, it explains that "Pirito's motion ignores one key, and dispositive fact: Pirito has himself brought a breach of contract claim against Penn World that is squarely within the scope of the Agreement's arbitration clause." Penn World's Resp. to Pl.'s MTD at 18. Penn World further suggests that granting Pirito's motion "would result in prejudice, duplication, multiple trials of the same issues and potentially divergent rulings." *Id.* at 19. As a result, Penn World argues that "Pirito has waived his arbitration rights under the Agreement," and that his motion should be denied. *Id.* at 27.

Pirito suggests that " '[w]here parties have agreed to submit claims to arbitration under a valid and enforceable arbitration clause or agreement, dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is proper.' " Pl.'s Mot. at 7 (quoting *Allstate Ins. Co. v. Masco Corp.,* 2008 WL 183651, at *2 (E.D.Pa.2008)). But our Court of Appeals has explained that the issue of whether a defendant "has or does not have a contract-based defense requiring arbitration rather than litigation .... is not a jurisdictional one." *Lloyd v. HOVENSA, LLC,* 369 F.3d 263, 272 (3d Cir.2004). We will consequently evaluate

Pirito's motion pursuant to Fed.R.Civ.P. 12(b)(6), not Rule 12(b)(1).

■ In evaluating a Rule 12(b)(6) motion to dismiss, we "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom," *Ordonez v. Yost,* 289 Fed.Appx. 553, 554 (3d Cir.2008) (internal quotation marks omitted), and "consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Brown v. Daniels,* 128 Fed.Appx. 910, 913 (3d Cir.2005) (internal quotation marks omitted). When, as here, a Rule 12(b)(6) motion to dismiss is premised on an affirmative defense appearing on the face of a plaintiff's pleading, "[t]he question to be answered ... becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis" for rejecting the affirmative defense. *Leone v. Aetna Cas. & Sur. Co.,* 599 F.2d 566, 567 (3d Cir.1979) (discussing a motion to dismiss based on noncompliance with the applicable limitations period). However, the Supreme Court has also reminded courts that affirmative defenses are "subject to rules of forfeiture and waiver." *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). We will thus consider the allegations in the pleadings and the documents attached thereto, as well as the litigation conduct of the parties, to determine whether (1) the affirmative defense of arbitrability may apply to the Penn entities' counterclaims; and, if so, (2) this defense is nonetheless subject to waiver or forfeiture.

■ Our Court of Appeals has noted that "a question of arbitrability arises only in two circumstances-first, when there is a threshold dispute over whether the parties have a valid arbitration agreement at all, and, second, when the parties are in dispute as to whether a concededly binding arbitration clause applies to a certain type of controversy." *Puleo v. Chase Bank USA, N.A.,* 605 F.3d 172, 178 (3d Cir. 2010). With respect to Penn Engineering's counterclaims, Pirito's motion to dismiss fails to satisfy *Puleo's* threshold inquiry. Penn Engineering was not a party to the Agreement (which contained an arbitration clause), its Guarantee contained no arbitration clause, and Pirito has identified no other agreement that might impose upon Penn Engineering an obligation to arbitrate its claims. We will thus deny Pirito's motion as to Penn Engineering's counterclaims.

Penn World, on the other hand, contends that "Pirito's Motion ignores the fact that Pirito's claim against Penn World ... is every bit as subject to arbitration as the Counterclaims." Penn World's Resp. to Pl.'s MTD at 21–22. Penn World thus appears to concede that its claims are subject to arbitration. We will consequently proceed to the second question we identified above: whether Pirito's affirmative defense is subject to waiver.

■ Our Court of Appeals has stressed that "prejudice is the touchstone for determining whether the right to arbitrate has been waived," *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925 (3d Cir. 1992), and has set forth six factors that may guide the waiver determination. *Id.* at 926–27. A fair reading of *Hoxworth* suggests, however, that its test was intended for situations where a party might have waived the right to arbitrate due to its acquiescence with the opposing party's litigation conduct, not for the exceptional case in which the party asserting the defense of arbitrability itself initiated the litigation by asserting arbitrable claims. We have found only one case from this Circuit in

which a party attempted to employ such a gambit. *See Expofrut S.A. v. M/V Aconcagua,* 280 F.Supp.2d 374 (E.D.Pa.2003) (Rufe, J.) (denying plaintiff's motion to stay proceedings pending arbitration).

▪ Moreover, our Court of Appeals has emphasized that "[a]s is evident by our repeated characterization of [the *Hoxworth* ] factors as a nonexclusive list, not all the factors need be present to justify a finding of waiver, and the waiver determination must be based on the circumstances and context of the particular case." *Nino v. Jewelry Exch., Inc.,* 609 F.3d 191, 209 (3d Cir.2010) (internal quotation marks and brackets omitted). Thus, "the investment of considerable time and money litigating a case may amount to sufficient prejudice to bar a later-asserted right to arbitrate," since to conclude otherwise might frustrate "the purpose behind arbitration itself-arbitration is meant to streamline the proceedings, lower costs, and conserve private and judicial resources." *Id.* Given the nonexclusive nature of the *Hoxworth* factors, the unique circumstances of this case, and *Nino's* admonition that prejudice and the purposes of arbitration should guide the waiver inquiry, we will thus dispense with a factor-by-factor examination of Pirito's entitlement to assert the arbitrability defense and focus on whether such an assertion would prejudice the Penn entities, complicate judicial proceedings, squander resources, and cause delay.

We find that it would. We first note that Pirito's breach of contract claim against Penn World plainly falls within the Agreement's arbitration clause since it concerns the "validity, interpretation, performance and termination" of "provisions of this Agreement" and does not concern "the preparation of the Closing Statement and any reduction of the Purchase Price under Section 2(d)." Agreement § 13(m).

Thus, Pirito has waived the defense of arbitrability not by passive acquiescence—as we more commonly see and as *Hoxworth* envisions—but by his active choice of this forum. By submitting his arbitrable claim to this Court, he has waived the argument that this Court is an inappropriate forum for the resolution of such claims. In this context, the fact that Pirito did assert the affirmative defense of arbitrability in his answer to the Penn entities' counterclaims, *see* Pl.'s Ans. at 19, diminishes in importance.

Second, Penn World rightly explains that if we grant Pirito's motion, the parties will be forced to litigate intimately related claims before different tribunals, since neither Pirito's claim against Penn Engineering nor Penn Engineering's counterclaims against Pirito are subject to arbitration. Penn World's Resp. to Pl.'s MTD at 25–26. Such an approach will not only waste the resources of the parties and the tribunals, it will raise the specter of inconsistent adjudications of the parties' rights and obligations.

Finally, Penn World notes that its "domestic counsel has spent considerable time on this matter since Plaintiff filed his Complaint in May 2009, and actively participated in two unsuccessful mediation sessions aimed at resolving the parties' numerous disputes." *Id.* at 26. We have similarly expended significant judicial resources in familiarizing ourselves with this complex litigation—to say nothing of the labor of Hercules Judge Hart undertook for so long—and we note that the parties have already filed and fully briefed three motions (aside from Pirito's motion to dismiss) in this action.

Under these circumstances—where Pirito has waived any argument that arbitrable claims should not be litigated in this forum—granting Pirito's motion would cause significant judicial inefficiency and

risk inconsistent outcomes. The parties and the Court have already devoted much ink, effort and time to these proceedings. It therefore simply makes no sense to dismiss Penn World's counterclaims in favor of arbitration. This is especially true given that the purpose of arbitration is to streamline litigation and reduce costs. We will consequently deny Pirito's motion to dismiss Penn World's counterclaims.

### B. *Penn World's Petition to Confirm Arbitration Award*

In Penn World's petition, it asked that the Court "confirm and enter judgment upon the Arbitration Final Award entered on September 18, 2009 by the Chamber of National and International Arbitration of Milan, in Milan, Italy in Arbitration No. 2308." Def.'s Pet. at 1. Penn World sought "an order confirming the Final Award, for entry of judgment in the amount (as of April 30, 2011) of $1,419,704, plus post judgment interest at the Euro Libor (1 month) rate, and for costs and such other relief as the Court may deem proper." *Id.* at 7. Penn World's proposed Order also noted that "this judgment fully resolves Count III of the Counterclaim." *Id.* at 8.

Pirito initially filed a response in opposition to this motion, *see* Pl.'s Resp. to Def.'s Pet., and then, by letter, "advise[d] the Court that Mr. Pirito wishes to withdraw his opposition to the Motion and consents to the entry of judgment in the form attached hereto." Pl.'s June 30, 2011 Letter at 1. As we noted in our July 21, 2011 Order, "the parties appear to agree that the Court should confirm the Chamber of National and International Arbitration of Milan's September 18, 2009 award in Arbitration No. 2308 in the amount of $1,391,886 with post-judgment interest at a rate of Euro Libor (1 month)." Order ¶ (g), July 21, 2011. However, the parties'

proposed judgments suggested that they disagreed "as to whether this judgment should (1) resolve Count III of Penn World's counterclaims; (2) explicitly reserve Pirito's rights before the Milan Court of Appeals and his other rights under the Federal Rules of Civil Procedure; or (3) be characterized as 'final.'" *Id.* ¶ (h).

We explained that it was unnecessary in any judgment to make a pronouncement as to Pirito's future rights, *id.* ¶¶ (m)(n), and that Penn World had not explained why confirming the Chamber's September 18, 2009 Award "resolved" Count III of the Penn entities' counterclaims. *Id.* ¶¶ (i)-(*l*). We also noted that the parties had not briefed us on the propriety of certifying any judgment as final pursuant to Fed. R.Civ.P. 54(b). *Id.* ¶¶ (*o*)-(s). We thus instructed Penn World "to show cause why we should issue a Rule 54(b) certification as to any judgment confirming the September 18, 2009 arbitration award" and gave Pirito leave to brief us on the same topic. *Id.* at ¶ 8.

Penn World and Pirito have now filed briefings responsive to our July 21, 2011 Order. Penn World suggests that "confirmation of the award is the ultimate disposition of a cognizable claim for relief," Penn World's Br. at 4, Aug. 3, 2011, and that "there is no just reason to delay making [the Award] final, thereby permitting enforcement." *Id.* at 6. Penn World further explains that "resolution of the Petition to Confirm *does* moot Count III; thus, it does not remain an alternate theory of recovery." *Id.* at 4. Pirito responds that "[t]he Judgment is not 'final' for Rule 54(b) purposes because the Appeal of Final Award II may require modification or vacation of the Judgment and it does not resolve an individual claim," since "Final Award II is inextricably intertwined with all of the Counterclaims." Pl.'s Br. at 1–2, Aug. 3, 2011.

In ruling on Penn World's petition, we must determine: (1) what it means to confirm the Chamber's September 18, 2009 Award; (2) whether such confirmation "resolves" Count III of the Penn entities' counterclaims, and, if so, in what manner; and (3) whether any judgment confirming the award should be certified as final.

We begin by returning to first principles. 9 U.S.C. § 201 provides that "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." Under § 203, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States ... shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." Finally, § 207 states that

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

■ Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"[2]) lists seven grounds upon which "[r]ecognition and enforcement of the award may be refused," New York Convention art. V, none of

which the parties have suggested apply here. Article VI provides that

> If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relief upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

Though Pirito initially suggested that Article VI should rule Penn World's petition, he has now withdrawn his opposition to the petition. We thus have the authority to confirm the Award pursuant to 9 U.S.C. § 207, and neither party suggests that we should refuse "[r]ecognition and enforcement of the award," New York Convention art. V, or "adjourn the decision on the enforcement of the award." *Id.* art. VI.

■ We thus turn to the question of what it means to confirm the September 18, 2009 Award. As we have already explained, Penn World submitted three prayers for relief to the Second Arbitration panel, seeking " '€ 1,485.677, deriving from the determination of Mr. Del Prete,' " " '€ 40,935.66 for the 50% of the costs of Mr Del Prete,' " " '€ 150,000—for legal costs for the proceedings *in volontaria girisdizione*,' " and " 'all the costs of these proceeding [*sic*].' " Ex. B to Def.'s Pet. ¶ 52 (quoting Penn World's Ex. C–5 at 13). Penn World did *not* seek a declaratory judgment from the Panel that Del Prete's report was valid, final, or binding upon the parties. The Panel decided that Pirito would pay Penn World a total of € 1,741,-882 plus interest,[3] representing nearly all

**2.** As Judge Haight has observed, "[b]ecause the Convention was drafted in New York under United Nations sponsorship, it is sometimes referred to in the literature as the 'New York Convention.' " *Spier v. Calzaturificio*

*Tecnica S.p.A.,* 663 F.Supp. 871, 872 n. 1 (S.D.N.Y.1987).

**3.** As Penn World explains, this amount differs from what it seeks in its petition to confirm

of the amounts Penn World requested. *Id.* at 32. En route, the Panel concluded that "[t]he conclusions of the Del Prete Report are valid, final and binding upon the Parties." *Id.* ¶ 116. This conclusion was not part of its decision, however.[4] In confirming the Award, then, we would confirm only Pirito's obligation to pay Penn World the sums that the Panel described in its decision; such confirmation would not constitute judicial affirmation that the Del Prete Report was "valid, final, and binding upon the Parties." *Id.*

■ We turn next to the effect of confirmation upon Count III of the Penn entities' counterclaims. Penn World argues that "Count III sought and the Final Award determined that Dr. Del Prete's determination of the Net Worth Deficit (€ 1,485,677 plus interest, costs and fees) should be enforced," Penn World's Br. at 5, Aug. 3, 2011, so that "resolution of the Petition to Confirm *does* moot Count III." *Id.* at 4 (emphasis in original). We observe that Penn World does not suggest that confirmation of the petition means that we have *granted* judgment in favor of Penn World on Count III,[5] as indeed it could not. Count III seeks "Enforcement of the Determination of Independent Public Accountant," and, as we have noted, confirming the September 18, 2009 Award does not mean that we have confirmed the findings of Del Prete's report. Instead, Penn World explains that confirming the Award grants it the relief it seeks under Count III, making that claim moot. We thus conclude that confirming the September-

ber 18, 2009 Award would permit us to dismiss Count III as moot.

■ We now arrive at our final question: whether any judgment confirming the September 18, 2009 Award should be certified as final pursuant to Rule 54(b), which provides that

When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

Our Court of Appeals has explained that "in setting the standards for a certification under Fed.R.Civ.P. 54(b), we have indicated that the court must determine whether there are multiple claims or merely alternative legal theories supporting a single claim." *Am. Motorists Ins. Co. v. Levolor Lorentzen, Inc.,* 879 F.2d 1165, 1171 (3d Cir.1989) (internal quotation marks omitted). Thus, "if a plaintiff presents a number of alternative legal theories to support a single recovery there is only one claim and there can be no certification." *Id.*

■ Penn World argues that "almost all petitions to confirm awards are filed as separate stand alone cases because, as here, they present only the issue of whether the award should be confirmed and enforced." Penn World's Br. at 4, Aug. 3, 2011. Penn World further asserts that

---

the arbitration award because "the Final Award totaled €2,057,208 before Penn World executed on the €1,069,283.34 in the escrow. After execution, €987,924 ($1,391,886 as converted on 5/24/11) remains to be collected." Penn World's Br. at Appx. I at 2, Aug. 3, 2011 (citations omitted).

4. Whether the Second Arbitration panel's determination as to Del Prete's report is issue

preclusive is a question we take up below when we consider the Penn entities' motion for partial summary judgment. *See* Section II.C, *infra.*

5. As we explain below, Penn World does seek this relief in its motion for summary judgment. *See* Section II.C, *infra.*

"Count III of the counterclaims is the only claim for recovery of the Net Worth Deficit." *Id.* (capitalization omitted). While we agree with Penn World's first proposition—that petitions to confirm arbitration awards can be stand-alone claims—we disagree with its second proposition, that its petition here constitutes an independent claim.

According to the Penn entities, "[i]n § 2(d) of the Agreement, Pirito represented and guaranteed on January 23, 2003 and February 5, 2003 that the minimum net worth would be not less than €815,-821." Defs.' Countercls. ¶ 23. The Penn entities thus contend that "[b]ased on the report of Dr. Del Prete, dated October 12, 2007, there is a gaping differential of €1,485,687 between the actual net worth on February 5, 2003 and the Minimum Required Net Worth as represented by Pirito and set forth in detail in the Agreement and Financial Statements." *Id.* ¶ 49. Count IV of the Penn entities' counterclaims alleges that "[a]s set forth in detail above, Pirito has breached of [*sic*] the Agreement, including but limited to Section[ ] 2 . . . . Pirito's breaches have caused millions of Euros in damages to Penn World," *id.* ¶¶ 194–95, so that "Penn World demands that judgment be entered against Pirito for all damages suffered by Penn World." *Id.* at 48. These allegations demonstrate that Penn World seeks damages under its breach of contract claim for Pirito's alleged misrepresentations in § 2(d) of the Agreement of the net worth deficit. This conclusion is bolstered by the Penn entities' argument, in their motion for partial summary judgment, that "[t]he Del Prete Report and the Final Award establish that Pirito's promises and representations as to the Net Worth were false. . . . They also will establish that Pirito breached the Agreement by breaching the net worth representation and guarantee." Defs.' MSJ Br. at 20.

Since Penn World concedes that Count III of the counterclaims and its petition to confirm arbitration award both seek "recovery of the net worth deficit," Penn World's Br. at 4, Aug. 3, 2011, it is apparent that the petition and Count IV present alternative theories—on the one hand, confirmation of an arbitration award, and, on the other, breach of contract—in support of a claim for recovery of the net worth deficit. As a consequence, Penn World's proposed judgment confirming the September 18, 2009 Award fails to satisfy the threshold inquiry under Rule 54(b) since it does not resolve "one or more" claims, but rather resolves one theory in support of its claim for payment of the net worth deficit.

We thus do not reach the question of whether there is just reason to delay enforcing the judgment, and we cannot certify such a judgment as final. We will accordingly grant Penn World's petition to confirm arbitration award as unopposed and dismiss Count III of the Penn entities' counterclaims as moot, but will decline to certify our Judgment in favor of Penn World as final.[6]

## C. The Penn Entities' Motion for Partial Summary Judgment

The Penn entities move for "I) partial summary judgment; II) determination that certain facts found in the Del Prete Report and Final Award are taken as established in this Action; and III) *in limine.*" Defs.' Mot. for Summ. J. ("Defs.'

---

6. We apply the exchange rate as published in today's *Wall Street Journal* (one € = $1.3047). Given that the Penn entities therefore cannot immediately enforce this Judgment against Pirito, we will entertain briefing from the parties on whether we should (and may) order Pirito to post security for this Judgment.

MSJ") at 1. In support thereof, the Penn entities argue that

Plaintiff Cataldo Pirito ... is contractually bound to accept as final the findings and conclusions of the Del Prete Report and the Final Arbitration Award in this litigation. Moreover, the standards for recognition of a foreign judgment, including arbitration awards, delineated in *Hilton v. Guyot,* 159 U.S. 113, 163–64, 205[, 16 S.Ct. 139, 40 L.Ed. 95] (1895) ... and the doctrine of issue preclusion prohibit Pirito from relitigating the facts found in the Del Prete Report and confirmed by the Final Award.

Defs.' MSJ Br. at 1–2. Pirito responds that "under Pennsylvania law,[7] Final Award II is not a final judgment since it is subject to the pending Appeal," and that "because Pirito challenged the Arbitral Tribunal's jurisdiction, neither the *Hilton* standards nor principles of comity require this Court to enter summary judgment." Pl.'s Resp. to Defs.' MSJ at 10.

As the Penn entities correctly observe, Fed.R.Civ.P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." The Penn entities thus seek summary judgment not only as to Count III of their counterclaims—a request rendered moot by our decision in Section II.B, *supra*—but also as to "the element of material misrepresentation in Count I of the Counterclaim and Defendants' Fifth and Eighth Affirmative Defenses; and the element of breach of the contract in the Counterclaims and in Defendants' Fourth, Eighth, and Eleventh Affirmative Defenses." Defs.' MSJ ¶ 2.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." *Bello v. Romeo,* 424 Fed.Appx. 130, 133 (3d Cir.2011). In evaluating a Rule 56 motion, we of course " 'must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence.' " *Eisenberry v. Shaw Bros.,* 421 Fed.Appx. 239, 241 (3d Cir.2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

■ The Penn entities first argue that the Agreement "mandates that disputed matters related to the net worth be resolved by an independent public accountant, 'and the determination of such accountant shall be binding on the parties hereto.' " Defs.' MSJ Br. at 19 (quoting Agreement § 2(d)). Pirito does not appear to respond to this argument, but examination of the language of the Agreement suggests that we should nonetheless reject it. Section 2(d) of the Agreement provides that

If the Buyer and the Seller are unable to resolve such dispute within 15 days after the Buyer is notified thereof, the disputed matters shall be referred to an independent public accountant satisfactory to the Buyer and the Seller, who shall be directed to determine the Net Worth of the Company as of the close of business on the business day immediate-

---

7. The parties agree that the Pennsylvania law of issue preclusion should apply here. *See* Pl.'s Resp. to Defs.' MSJ at 11 n. 3 ("Pirito agrees with Defendants that Pennsylvania law applies to the Court's determination of wheth-

er Final Award II should have preclusive effect."); Defs.' MSJ Reply 3 n. 5 ("Plaintiff and Penn are in agreement that Pennsylvania law governs this collateral estoppel issue.").

ly preceding the Closing Date and the determination of such accountant shall be binding on the parties hereto. If the Buyer and the Seller are unable to agree upon an independent public accountant, the Buyer and the Seller shall each designate an independent public accountant, who shall choose the independent public accountant that will finally determine the Net Worth of the Company as of the close of business on the business day immediately preceding the Closing Date.

As this language makes clear, the phrase "such accountant"—describing one whose determination binds the parties—refers to "an independent public accountant satisfactory to the Buyer and the Seller." *Id.* Since the Penn entities have pointed to no evidence suggesting that Del Prete was "satisfactory" to Pirito, we cannot conclude that the plain language of the Agreement makes Del Prete's determination binding upon Pirito.[8]

The Penn entities' second argument is that "[f]ederal courts permit 'the use of a foreign judgment [and arbitration awards] to estop relitigation of an issue if the judgment satisfies (1) the *Hilton* requirements for recognition of a foreign judgment, and (2) the requirements of collateral estoppel.'" Defs.' MSJ Br. at 21–22 (quoting *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F.Supp.2d 19, 33 (D.D.C. 2007)) (brackets in Defs.' MSJ Br.). Because "the Final Award satisfies the Hilton Standards," *id.* at 26, the Penn entities suggest that "[t]his Court should not permit Pirito's continued attempt to evade ...

the valid judgment of the arbitrators in the Final Award." *Id.* at 28.

Pirito responds that "Plaintiff is challenging the jurisdiction of the Arbitral Tribunal in the Appeal," and that "[t]herefore, the principles of comity do not require that this Court find that the Del Prete Report and Final Award II are binding." Pl.'s Resp. to Defs.' MSJ at 14. Pirito also explains that "Final Award II is not ... a final judgment on the merits and cannot have preclusive effect." *Id.* at 12.

▇ In *Hilton*, the Supreme Court held that

When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

---

**8.** Our decision in this respect does not, however, foreclose the possibility that (1) the alternative mechanism for determining the net worth envisioned in Agreement § 2(d)—"the Buyer and the Seller shall each designate an independent public accountant, who shall choose the independent public accountant that will finally determine the Net Worth of

the Company"—might produce a binding determination; or (2) refusal by one party to participate in the mechanism established by § 2(d) might justify recourse to use another mechanism for arriving at a binding determination of the net worth. The Penn entities have not briefed us on either of these possibilities.

159 U.S. at 159–60, 16 S.Ct. 139. On the basis of this test—and *Hurst*'s suggestion that a foreign judgment may have issue preclusive effect if it satisfies the requirements for collateral estoppel, 474 F.Supp.2d at 33—we note three problems with the Penn entities' suggestion that because of *Hilton* and the doctrine of collateral estoppel the September 18, 2009 Award estops Pirito from re-litigating issues the Second Panel decided. While two of these problems are not necessarily insuperable, the third bars us from granting the Penn entities' motion.

First, as Pirito notes, he has challenged—and indeed is currently challenging—the Second Arbitration panel's jurisdiction over Penn World's claims. Though the Penn entities suggest that "Pirito's arguments have been considered, repeatedly, and rejected, repeatedly," Defs.' MSJ Br. at 28, we note that one arbitrator supplied a well-reasoned dissent to the Second Arbitration Panel's February 13, 2009 Partial Award on Jurisdiction. While we (of course) express no view as to the correctness of this dissent, our examination of it reveals that Pirito's jurisdictional objections are, at the very least, not frivolous. The parties have not fully briefed us on whether the Second Arbitration panel had jurisdiction over Penn World's claims, and, even if they had, we doubt whether it would be wise[9] to make a jurisdictional determination of our own on this At a minimum, we lack confidence that the jurisdictional prong of the *Hilton* test has been satisfied here.

Second, the Penn entities add "[and arbitration awards]" to the language of *Hurst* but present no case law supporting this amendment, and indeed concede that neither "the Third Circuit [nor] Pennsylvania .... has expressly addressed how these two doctrines should apply to a foreign arbitration award governed by the New York Convention." *Id.* at 22 n. 11. Our examination of *Hilton* reveals that it limits its application to a judgment rendered by a "court of that country," not a private tribunal that happens to convene in another country. This limitation is made explicit by *Hilton*'s description of the grounds on which it rests, *i.e.* comity:

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the *legislative, executive, or judicial acts of another nation,* having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton,* 159 U.S. at 143, 16 S.Ct. 139 (emphasis added). *Hilton* thus makes clear that comity is grounded in mutual respect between sovereigns for their official acts. The Penn entities have not explained why considerations of comity require a *national court* of this country to accord similar respect to the decisions of a *private tribunal* in another country.[10] As a result, we

---

**9.** The interests of comity that the Penn entities espouse suggest that we should defer to the Italian court where Pirito is prosecuting his appeal of the Second Arbitration panel's jurisdiction rather than arrive at an independent determination—possibly subject to later contradiction by that court—in order to apply the *Hilton* test. However, the parties have not briefed us on this question. question.

**10.** Of course, 9 U.S.C. § 207 requires courts to confirm foreign arbitral awards "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said [New York] Convention." *See also* Section II.B, *supra.* But the fact that this statute, implementing an international treaty, imposes this obligation does not necessarily mean that *comity* does so as well.

are not convinced that *Hilton* obliges us to accord issue preclusive effect to the decisions of foreign arbitral tribunals.

■ To be sure, these are not mere questions of good international etiquette. The Supreme Court has stressed that they are founded on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' [international arbitration] agreement." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 629, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Our Court of Appeals has also held that "[u]nder Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel," *Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir.1999). Judge Buchwald has noted that "in the Second Circuit, the doctrine of collateral estoppel has long been applied to arbitrator's decisions, and the effects of foreign arbitration are no less preclusive than domestic arbitration." *Alghanim v. Alghanim*, 828 F.Supp.2d 636, 664–65, 2011 WL 5978350, at *24 (S.D.N.Y.2011) (citations omitted). We thus do not reject the possibility that comity or some other doctrine *may* oblige us to estop re-litigation of an issue a foreign arbitral tribunal decides, provided that tribunal had jurisdiction and the elements of collateral estoppel have been satisfied. The possibility that such estoppel could apply here, however, does not mean the September 18, 2009 Award fails to satisfy the collateral estoppel elements.

■ This brings us to the third problem with the Penn entities' arguments. As our Court of Appeals has rehearsed,

Collateral estoppel, also known as issue preclusion, prevents relitigation of a particular fact or legal issue that was litigated in an earlier action. In order for the doctrine to apply, (1) the issue decided in the prior adjudication must be identical to the one presented in the later action, (2) there must be a final judgment on the merits and (3) the party against whom the doctrine is asserted must have been a party or in privity with a party to the prior adjudication and have had a full and fair opportunity to litigate the issue in question in the prior action.

*Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169 (3d Cir.1999).

Pirito points out that in Pennsylvania "there are two lines of cases that address whether a judgment subject to appeal is 'final' for claim preclusion purposes," Pl.'s Resp. to Defs.' MSJ at 12. One of these series of cases holds that a judgment is not final for collateral estoppel purposes while an appeal from that judgment is pending. The other maintains that a state court judgment is final for these purposes until it has been reversed. *Id.* According to Pirito, our Court of Appeals has concluded that in light of this split, a " 'District Court should stay its determination until the issue is resolved upon appeal.' " *Id.* (quoting *Ashford v. Skiles*, 837 F.Supp. 108, 115 (E.D.Pa.1993)) (Brody, J.) (citing *Bailey v. Ness*, 733 F.2d 279, 283 (3d Cir.1984)). The Penn entities reply that in *Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872, 876 (1996), "the Supreme Court resolved the 'split' in Pennsylvania authority upon which Plaintiff relies in his brief," Defs.' Reply in Supp. of Defs.' MSJ ("Defs.' MSJ Reply") at 3, and concluded that " '[a] judgment is deemed final for purposes of *res judicata* or collateral estoppel unless or until it is reversed on appeal.' " *Id.* at 4 (quoting *Shaffer*, 673 A.2d at 874–75) (emphasis omitted).

It is true that *Shaffer* overruled cases standing for the proposition that "a state court judgment in Pennsylvania is not considered a final judgment for purposes of *res judicata* or collateral estoppel while an appeal is pending," 673 A.2d at 874 n. 2. Importantly, *Shaffer* considered the preclusive effect of a criminal conviction in state court—not an arbitration award. Given that *Shaffer* referred to "judgment[s]" and "state court judgment[s]" in its holdings, it is by no means clear that it meant it should apply to arbitral awards as well. Indeed, recent jurisprudence in Pennsylvania law suggests that it did not.

Several years before *Shaffer*, the Superior Court of Pennsylvania reiterated that "[a]n arbitration award from which no appeal is taken has the effect of a final judgment on the merits." *Dyer v. Travelers*, 392 Pa.Super. 202, 572 A.2d 762, 764 (1990) (citing *Ottaviano v. SEPTA*, 239 Pa.Super. 363, 361 A.2d 810, 814 (1976)). In 2003—seven years after *Shaffer* was decided—the Superior Court of Pennsylvania cited *Dyer* in explaining that because "[t]he Robbinses never filed a notice of appeal from the arbitrator's award entered against Kathleen Robbins in favor of the Bucks in *Buck v. Robbins*," the "award became a final judgment." *Robbins v. Buck*, 827 A.2d 1213, 1214 (Pa.Super.2003). That same year, a Philadelphia Court of Common Pleas cited *Ottaviano* in explaining, with respect to an arbitration, that since "Judge Gafni has ruled on the issue and AHP has represented that it does not intend to appeal, that ruling constitutes a final order, which has preclusive effect with respect to the issue before Judge Gafni." *Axcan Scandipharm, Inc. v. Am.*

Home Prods., 2003 WL 21731124, at *2 (Phila.Ct.Com.Pl.2003). And just three years ago, Judge Connor explained that "Pennsylvania law considers an arbitration award to be 'final' in either of two circumstances. Most obviously, an arbitral award is final when it has been judicially confirmed. State law also treats as final an unconfirmed award from which no appeal is taken." *Novinger Grp., Inc. v. Hartford Life & Annuity Ins. Co.*, 2008 WL 5378288, at *11 (M.D.Pa.2008) (internal citations omitted).

█ Against this authority, the Penn entities present no cases that suggest *Ottaviano* or *Dyer* have been reversed with respect to their holdings that only unappealed arbitral awards constitute final judgments for preclusive purposes. We will thus defer to admittedly non-definitive Pennsylvania case law holding that, notwithstanding the Pennsylvania Supreme Court's decision in *Shaffer*, arbitral awards are not final judgments while appeals remain pending.

█ The Penn entities' motion for partial summary judgment—which also seeks a determination that certain facts in Del Prete's report are taken as established, and to limit both discovery and the use of evidence—depends either on the contractually binding nature of Del Prete's report or on the issue preclusive effect of the September 18, 2009 Award. But as we have explained, the plain language of the Agreement does not make Del Prete's report binding, and the Award does not have issue preclusive effect because an appeal of the Award remains pending.[11] We thus will deny the Penn entities' motion.

---

**11.** We recognize that should Pirito's appeal be resolved in the Penn entities' favor, we would then be able to conclude that (1) the Second Arbitration Panel had jurisdiction over the Penn entities' claims, and (2) the

September 18, 2009 Award constitutes a final judgment, so that the Award might have issue preclusive effect. We invite the parties to brief us on whether they would prefer to

### D. *The Penn Entities' Motion for Costs*

Finally, the Penn entities seek "to require Plaintiff Cataldo Pirito, a resident of Brazil, to provide security for the approximately $244,000 of anticipated recoverable costs that will be incurred by Defendants during discovery and the pretrial proceedings in this matter." Defs.' Mot. Costs at 1. Pirito responds that "Defendants' estimation of taxable costs, in excess of $244,000, far exceeds any reasonable assessment of costs for which Pirito should be obligated to provide security," Pl.'s Resp. to Defs.' Mot. Costs at 2, though Pirito concedes that "because he is a foreign citizen, this Court may grant some manner of the relief requested in the Motion for Costs." *Id.*

█ Loc. R. Civ. P. 54.1(a) provides that

> In every action in which the plaintiff was not a resident of the Eastern District of Pennsylvania at the time suit was brought, or having been so afterwards removed from this District, an order for security for costs may be entered, upon application therefor within a reasonable time and upon notice. In default of the entry of such security at the time fixed by the court, judgment of dismissal shall be entered on motion.

Moreover, under 28 U.S.C. § 1920,

> A judge or clerk of any court of the United States may tax as costs the following:
>
> . . .
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> . . .
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Judge Robert Kelly has explained that while Rule 54.1(a) "does not list specific factors a district court should consider in requiring a plaintiff to post security," decisions from this District suggest that a court should "evaluate[ ] the likelihood of a plaintiff's ultimate success and a plaintiff's ability to post security or pay costs in making its determination." *Van Bui v. Children's Hosp. of Phila.*, 178 F.R.D. 54, 55 (E.D.Pa.1998).

While Pirito's claims do not seem frivolous,[12] he has conceded that it would be reasonable to "grant some manner of the relief requested in the Motion for Costs" given his foreign citizenship. We thus need not tarry long on the *Van Bui* inquiry and instead may proceed directly to consider the Penn entities' claims for costs. The Penn entities identify five costs that they suggest would be taxable against Pirito under § 1920: "costs of transcribing depositions ($14,560); costs of translation services at depositions in United States and Europe ($9,800); costs of videotaping depositions (in Europe) ($12,800); costs of translating documents produced and collected in discovery ($204,000); copying costs ($3,000)." Defs.' Mot. for Costs ¶ 17.

proceed with discovery at this time or stay proceedings pending resolution of the appeal.

12. In making this observation, we measure Pirito's claims against a low bar; our evaluation should not be taken to suggest that he is ultimately likely to prevail on the merits.

Of these costs, we begin by considering the claim for "costs of translating documents produced and collected in discovery." *Id.* The Penn entities argue that "[t]his Court has ... confirmed that costs for translation of necessary documents, including testimony, are recoverable costs under Rule 54." Defs.' Br. in Supp. of Mot. Costs ("Defs.' Costs Br.") at 9 (citing *Lockett v. Hellenic Sea Transps., Ltd.*, 60 F.R.D. 469, 473 (E.D.Pa.1973) (Newcomer, J.)). Pirito responds that "[t]ranslation costs are not listed as an appropriate cost under 28 U.S.C. § 1920(6)" and cites in support two district court cases from outside this Circuit, one of which having been overruled. Pl.'s Resp. to Mot. Costs at 10. On the one hand, courts within this Circuit have taxed the costs of translating documents under § 1920. *See Lockett*, 60 F.R.D. at 473; *Lazaridis v. Wehmer*, 2008 WL 4758551, at *1 (D.Del.2008) (Robinson, J.) ("Had plaintiff prevailed in this action he could have sought the costs of translation pursuant to 28 U.S.C. § 1920."). On the other hand, in legal usage a distinction is often drawn between *translators* and *interpreters,* with the latter appearing to be a subset of the former. *Translation* means "[t]he transformation of language from one form to another; esp., the systematic rendering of the language of a book, document, or speech into another language," *Black's Law Dictionary* 1637 (9th ed. 2009), while *interpreter* means "[a] person who translates, esp. orally, from one language to another; esp., a person who is sworn at a trial to accurately translate the testimony of a witness who is deaf or who speaks a foreign language." *Id.* at 895.

 Luckily, we need not resolve the question of whether "compensation of interpreters" under § 1920(6) includes the cost of translating documents, because the Penn entities have failed to support their request for security for such costs with details sufficient to permit us to conclude that these costs are necessary. As Judge Newcomer noted in *Lockett,* "[n]ecessity is indeed the proper standard" for determining whether a cost is taxable. 60 F.R.D. at 473. The Penn entities merely aver that "Penn Engineering assumes that it will gather three to four boxes of documents during discovery in Italian, French or Portuguese that will need to be translated at a cost of $204,000–272,000." Defs.' Costs Br. at 9. Without more information about these "boxes of documents," we cannot at this juncture determine whether they are necessary to the Penn Entities' defense of this action. We thus at this time (and without prejudice to later determination on a less vaporous record) deny the request for costs of translating such documents.

The Penn entities' other requests (which total $40,160) are similarly speculative, *see* Defs.' Mot. Costs ¶¶ 18–20, 22, and we must further discount these requests because Pirito's claims do not appear to be frivolous. We accept, however, that the Penn entities' are likely to incur significant costs in defending this complex transnational commercial action. We will accordingly grant in part the Penn entities' motion for security for costs in discovery, in the amount of $20,000.

### ORDER

AND NOW, this 22nd day of December, 2011, upon consideration of plaintiff and counterclaim defendant Cataldo Pirito's complaint (docket entry # 1), defendants and counterclaim plaintiffs Penn Engineering World Holdings ("Penn World") and Penn Engineering & Manufacturing Corp.'s ("Penn Engineering's," and collectively, the "Penn entities' ") answer to Pirito's complaint and counterclaims (docket entry # 7), Pirito's answer to the Penn

entities' counterclaims (docket entry # 11), the Penn entities' motion for costs (docket entry # 30) and Pirito's response thereto (docket entry # 35), Penn World's petition to confirm arbitration award (docket entry # 31), Pirito's response thereto (docket entry # 36), the Penn entities' reply brief in support of the petition (docket entry # 39), Pirito's letter withdrawing his opposition to the petition (docket entry # 43), Penn World's letter regarding the petition (docket entry # 45), Pirito's letter regarding the petition (docket entry # 46), our July 21, 2011 Order instructing Penn World to show cause why this Court should certify as final any judgment confirming the arbitration final award (docket entry # 49), the parties' responses to our Order to show cause (docket entries # 53 and 54), Pirito's motion to dismiss for lack of jurisdiction (docket entry # 38) and the Penn entities' responses thereto (docket entries # 41 and 42), the Penn entities' motion for partial summary judgment (docket entry # 44), Pirito's response and affidavit in opposition thereto (docket entries # 47 and 48), and the Penn Entities' reply in support of the motion for summary judgment (docket entry # 51), and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Pirito's motion to dismiss for lack of jurisdiction (docket entry # 38) is DENIED;

2. Penn World's petition to confirm arbitration award (docket entry # 31) is GRANTED AS UNOPPOSED IN PART;

3. Count III of the Penn entities' counterclaims (docket entry # 7) is DISMISSED AS MOOT;

4. The Penn entities' motion for partial summary judgment (docket entry # 44) is DENIED;

5. The Penn entities' motion for costs (docket entry # 30) is GRANTED IN PART;

6. By January 6, 2012, Pirito shall PROVIDE security for costs in the amount of $20,000 by depositing that amount in the Registry of the Court; and

7. By January 13, 2012, the parties shall FILE briefs as to whether the Court should (1) require Pirito to post security with the Clerk of Court for the Judgment entered this day; and (2) stay these proceedings pending resolution of Pirito's appeal of the September 18, 2009 Award.